217 N.J. Super. 147 (1986)
524 A.2d 1330
FRANCIS J. KELLY, PLAINTIFF,
v.
BERNADETTE T. KELLY, DEFENDANT.
Superior Court of New Jersey, Chancery Division Ocean County.
Decided May 29, 1986.
*148 Frank A. Louis for plaintiff (Pogarsky & Louis, attorneys).
*149 Alan J. Cornblatt for defendant.
CLYNE, J.S.C.
The issue presented is whether, in a post-judgment setting, a noncustodial parent should have overnight visitation in his home in the presence of an unrelated woman and her son. This court concludes that the father in this case should have such visitation.
The court makes the following factual findings: The parties were married on October 7, 1972, in New York State. At that time, Mrs. Kelly was a nurse. Dr. Kelly was in medical school. Twin boys were born October 25, 1976.
Dr. Kelly filed a complaint for divorce on June 10, 1982 based on an 18-month separation. Mrs. Kelly filed an answer and a counterclaim on July 8, 1982. The counterclaim was also based on the grounds of an 18-month separation. At the time of the divorce, Mrs. Kelly resided with the children in a condominium located in Lakewood, which was purchased jointly by the parties. Dr. Kelly resided alone in a three-bedroom home in Toms River. Dr. Kelly was dating Margaret Doherty during the separation. In October 1982, the Kelly boys were introduced to Margaret Doherty and her son, Casey.
In July 1983, the parties reached an interim agreement as to issues of custody and visitation. The agreement was not reduced to writing. On the day of trial, September 13, 1983, the parties reached a settlement of the entire case which was placed upon the record. A dual judgment of divorce was executed December 23, 1983. The transcript of the September 13, 1983 hearing was attached to the judgment.
Paragraph B of the final judgment provides:
Neither party will do anything which might have an adverse effect upon the safety, physical, mental or moral welfare of the children. Neither party will do anything to alienate the feelings of affection which the children have for both parents.
*150 In October 1983, Margaret Doherty and her son, Casey, moved into Dr. Kelly's home. In February 1984, Dr. Kelly took his sons to Vermont on a ski vacation. They were accompanied by Ms. Doherty and her son. The incident increased the already extreme tension between the parties. The doctor has not enjoyed overnight visitation with his sons since the Vermont ski trip.
In March 1984, Mrs. Kelly moved for modification of the final judgment seeking restraints under DeVita v. DeVita, 145 N.J. Super. 120 (App.Div. 1976), or in the alternative an interpretation that the judgment contemplated the restraints established in DeVita. In April 1984, Dr. Kelly cross-moved for a plenary hearing. On May 3, 1984, the family intake service of the Ocean County Probation Department was requested to conduct an interview. Mediation of the case was attempted without success. A court appointed psychologist was designated to conduct a psychological evaluation of the parties and advise the court of any adverse impact that overnight visitation might have on the children. A hearing was conducted after the court received the expert's report. At the hearing, Mrs. Kelly, Dr. Kelly, the psychologist and an expert engaged by Mrs. Kelly testified.
Defendant argues that the custody and visitation agreement entered into by the parties, although not specifically set forth in the final judgment, envisioned that neither party would have the children overnight in the presence of an unrelated person of the opposite sex. Mrs. Kelly testified that she and Dr. Kelly had been raised as Catholics and continued to be practicing Catholics after reaching adulthood. Therefore, Mrs. Kelly asserts, the words set forth in the final judgment mean, when read in the light of the parties' religious faith, that there shall be no overnight contact by the children with an unrelated person of the opposite sex.
Dr. Kelly testified that when the precise language limiting overnight visitation was suggested he specifically rejected the *151 proposal. He testified that he had formed a relationship with Ms. Doherty by that time. Indeed, Mrs. Kelly acknowledged that after the divorce she knew Dr. Kelly's girlfriend would "come out of the woodwork." Dr. Kelly testified that the final language was a compromise in which he gave up a claim for joint custody and his wife gave up the limitation on overnight visitation.
The provisions of the final judgment were the product of agreement. Clearly, the provision dealing with the protection of the children's morals is sufficiently ambiguous to permit oral testimony as to the meaning of the agreement. Griffith v. U.S., 245 F. Supp. 678 (D.N.J. 1965), aff'd 360 F.2d 210 (3 Cir.1966).
Based upon the testimony and the ambiguous wording in the agreement, the court finds that there was no prohibition to overnight visitation in the presence of an unrelated person of the opposite sex. Although Mrs. Kelly may have thought that the use of the word "morals" in the agreement meant the kind of limitation expressed in DeVita, such was not the case with Dr. Kelly. Dr. Kelly specifically intended to avoid the DeVita language. There was no meeting of the minds. Without clear language in the agreement and in light of the dramatically opposed testimony, this court is not prepared to interpret the agreement as imposing DeVita restraints.
Mrs. Kelly argues in the alternative, that even if the original agreement did not preclude Dr. Kelly from having his children overnight in his home, this court should now impose such restraints based on the DeVita rationale.
In DeVita v. DeVita, supra, the Appellate Division held that the personal wishes of a parent are to be considered by the court when deciding conditions of custody provided they relate to the paramount consideration of the safety, happiness, physical, mental and moral welfare of the child. Id., 145 N.J. Super. at 128. Mrs. DeVita was fearful that the moral welfare of her children might be endangered by the presence overnight of a *152 female friend in the father's household and that such exposure would not be conducive to the moral welfare of the children. In the final judgment of divorce, Mr. DeVita was restrained from having a female friend staying overnight in his household when his children were visiting overnight. The seven DeVita children were between the ages of eight and twenty. There was no evidence of sexual misconduct on the part of Mr. DeVita with his female friend in the presence of the children. Also, no evidence was presented as to any harmful psychological effect upon the children of the marriage by reason of the frequent presence of the female friend in Mr. DeVita's household. There was testimony that, at times, discord developed between the DeVita children and the children of Mr. DeVita's companion.
A divided Appellate Division affirmed the imposition of restraints on visitation over Judge Antell's dissent. The majority recognized Mrs. DeVita's concern for the moral welfare of her children. The court affirmed the restraint imposed by the trial court based on Mrs. DeVita's concern for the possible endangerment of the moral welfare of the children. The court considered the personal views of Mrs. DeVita as they related to the welfare of the children. It did not pass judgment upon the morality or immorality of Mr. DeVita's actions, but simply recognized the concern expressed by Mrs. DeVita to protect the moral welfare of her children. The opinion is quoted at length so as to more fully set forth the court's rationale:
Here the mother apprehends that the moral welfare of her children may be endangered by the presence overnight of a female friend in the father's household and that such exposure is not conducive to that moral welfare. The father correctly contends that there is no evidence in this regard of any improper action between him and his female friend.
It is not for the court to determine what is moral or immoral in this context. Nor do we do so. We merely recognize that in the mother's view the moral welfare of the children is possibly endangered if the trial judge's restriction is not upheld.
We do not decide whether the mother's views are correct or incorrect but she has a rightful interest in the moral welfare of the children which is entitled to respect. Further it must be acknowledged that her views are not contrary to *153 those of a substantial body of the community. We cannot say that her apprehension that the moral welfare of the children is threatened is arbitrary. While we also recognize the viewpoint of defendant father, it is evident that there is no possibility of any harm to the moral welfare of the children if the order prohibiting the presence of the female friend overnight is affirmed. Even though there is no present evidence of sexual activity on the part of the father and his female friend in his household we cannot gainsay the possibility thereof in the circumstances present. DeVita v. DeVita, [145 N.J. Super. at 128]
It is clear that the Appellate Division held that whether there should be DeVita type restraints is a matter of the trial judge's discretion. The court further held that the trial judge may consider the morals of the custodial parent in imposing such restraints.
Although this court's appointed expert testified that, to some extent, Mrs. Kelly's motives in objecting to the overnight visitation were based upon her desire to control Dr. Kelly, it is clear that the overriding basis of Mrs. Kelly's objection was her morality. Mrs. Kelly purports that her objection is bona fide by pointing out that the Catholic church supports her position and that she has been a life-long practicing Catholic. The court has no difficulty in accepting the sincerity and credibility of Mrs. Kelly's testimony as to her beliefs regarding morality and religion. Defendant asserts that the unrestrained overnight visitation will have an adverse impact upon the moral welfare of the children. Defendant cites DeVita at length, apparently for the proposition that once the custodial parent's concern for the moral welfare of the children is raised, the court is constrained to issue DeVita-type restraints upon the parent's request. Defendant argues that the parental concern for the moral welfare of the children is the standard by which the imposition of DeVita restraints is to be determined.
This court distinguishes DeVita by holding that the moral outrage of the custodial parent is not the only basis upon which this court may exercise its discretion in dealing with the issue presented. The court's exercise of discretion in this case must be based on the best interests of children. Beck v. Beck, 86 N.J. 480 (1981).
*154 In this case there has been expert testimony offered by the court appointed expert and defendant's expert. The report and testimony of the court expert demonstrate that a denial of overnight visitation could prove harmful to the psychological development of the Kelly children. His report concludes that allowing Mrs. Kelly to thwart the visitation under consideration could "impede the boys' psychological imperative to identify with their father or create an exaggerated fear of moral condemnation or foster inflexibility and lack of tolerance, or have other deleterious lifelong impact on the structure of their personalities." The expert's testimony suggests that a denial of the overnight visitation in question is "the option of greatest potential harm to them [the children] psychologically speaking." He further indicated that if they are not allowed the overnight visitation without restriction, the children, in his opinion, would be traumatized. The doctor explained the developmental dynamics which formed the basis for his opinion regarding the high risk of trauma which the children would face, should Mrs. Kelly be granted the restriction on visitation she seeks. He concluded:
For the children to essentially be given a message that their father is a bad man by virtue of something he's doing and that he's so bad that they have to be kept away from him at times that he's engaging in this kind of behavior sets up a high risk situation for his children  more, [sic] made more so of a risk because they are male children and even more so of a risk because they are twins.
The court expert's report and testimony clearly indicate that in this case, it would be better for the children to experience the overnight visitation with Dr. Kelly and his female friend than to restrain such visitation. The expert stressed to the court and litigants that he is a psychologist and his opinion is based on the mental and psychological development of the children. He, in no way, claims to be, nor does the court accept him to be, in a position to impose moral values upon any party.
The psychiatrist who has treated defendant for some time was called by defendant as an expert witness. She is a board-certified psychiatrist. She did not, at any time, interview or *155 treat Dr. Kelly or either of the Kelly children. She indicated that she is not a child psychologist. Her position was that, in general, nine-year-old children should not be confronted with a split in value systems as exists between Dr. and Mrs. Kelly. However, she was unable to give an opinion about Michael or Daniel Kelly since she has not interviewed them. She stated upon cross-examination and through examination by the court that it would be possible for a nine-year-old (the Kelly boys are now nine-years-old) to experience the type of visitation Mr. Kelly desires without harm to their psychological development. She concluded the danger posed to a child's well-being when confronted with a value split, depends upon the individual child and his or her maturation process. Her testimony was clear that under certain circumstances, when properly addressed by the parents, the experience of this value split would not be debilitating.
The court's expert concurred that, if properly handled, dealing with the value split could be a growth experience. By openly discussing the issue with the children, Mrs. Kelly can present to the children her moral teachings and at the same time allow Dr. Kelly to see his children as requested.
The clear and convincing evidence presented in this case establishes that the children's best interest would be served by Dr. Kelly having overnight visitation with his sons notwithstanding the fact that he resides with Margaret Doherty.
In reaching this conclusion, the court points out the following factors:
1. The question does not arise in a pre-divorce separation setting where the children are usually confused, insecure and are required to sort out their feelings for their parents. In a pre-divorce setting the children must come to grips with the loss of a relationship between their parents. They should not, in most circumstances, be required to comprehend a new relationship *156 between their father or mother and someone else. Moreover, the parents during separation are usually so involved with their own emotional turmoil that they are ill-equipped to assist their children in dealing with either a mother's or father's new relationship.
2. The relationship between Dr. Kelly and Margaret Doherty has been long-term and apparently stable.
3. There is absolutely no evidence indicating that anything improper occurs while the Kelly children are with Dr. Kelly and Margaret Doherty.
4. The psychological growth of the Kelly boys will be nurtured by the proposed visitation and the impact of the message that their father is not a bad man enhanced.
Therefore, the existing visitation is to be immediately expanded so as to eliminate the hiatus created by Dr. Kelly returning the children on Saturday night and picking them up Sunday morning. In order to effectuate this decision and yet preserve in the children's minds the positive influence of Mrs. Kelly's moral values, the court instructs counsel to confer for the purpose of suggesting a family therapist who shall counsel with all parties affected by this order. The therapist is to assist the parties in communicating to the Kelly children the "value split" between Dr. and Mrs. Kelly. This communication should be handled in a positive manner. The children should be guided in understanding Mrs. Kelly's moral views. The therapist should assist the children in perceiving Dr. Kelly in a positive light. He or she should also help Dr. Kelly in communicating to the children that although he disagrees with his former wife's view of the morality of his relationship, the children should not necessarily reject their mother's moral views. By dealing with the children in such a way, the parties will be nurturing within them respect for their parents while preserving their own moral positions. The parties will thus be encouraging the children to *157 keep the biblical commandment, "Honor thy father and mother...." Exodus 20:12.
Finally, Mrs. Kelly argues that she has a constitutional right to preclude the proposed overnight visitation. Mrs. Kelly asserts that she has moral objections to the requested visitation and her moral objections are based upon her religious beliefs. Therefore, she contends it would be a violation of her First Amendment constitutional right of Freedom of Religion to allow the proposed overnight visitation. Any constitutional right a parent has with regard to his or her children, is always subject to the best interests of those children. In dealing with a parent's rights of visitation, it has been held:
The right of a parent, including a homosexual parent, to the companionship and care of his or her child, insofar as it is for the best interests of this child is a fundamental right protected by the First, Ninth and Fourteenth Amendments to the United States Constitution. [In re J.S. & C., 129 N.J. Super. 486, 489 (Ch.Div. 1974), aff'd 142 N.J. Super. 499 (App.Div. 1976)].
Although there may be a question of whether Mrs. Kelly's constitutional right of Freedom of Religion is greater than Dr. Kelly's constitutional right of visitation, the Appellate Division, in dealing with the interrelationship of a father's right of visitation and a child's religious training has said:
... we conceive that the needs of the children for both their father's visitation and Hebrew education may possibly be accommodated if the alternatives to the curtailed visitation were fully developed. Where there is a conflicting situation, a method of achieving for the children the benefits of their visitation with defendant and of their religious training should be sought, even at the expense, perhaps, of less than ideal religious instruction. Any deficiencies in such education may be overcome if the children desire it when they become more mature. [Wagner v. Wagner, 165 N.J. Super. 553, 557 (App.Div. 1979)]
This court holds in this case that any constitutional right of defendant as regards the children, in light of this opinion, must fall in favor of the best interests of the Kelly twins.
Counsel for plaintiff is hereby instructed to prepare an order consistent with this opinion.