288 N.J. Super. 590 (1994)
672 A.2d 1299
JANET LYNN HOEFERS, PLAINTIFF,
v.
WILLIAM H. JONES, SR., DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part Gloucester County.
Decided April 29, 1994.
*595 John S. Eory, of Ulrichsen, Amarel & Eory, for Plaintiff.
Louise D. Fletcher, for Defendant.
HERMAN, J.S.C.
In this post-judgment plenary application, defendant/father seeks termination of joint custody agreement terms requiring him to pay non-public, primary school tuition for the two children of the marriage. He asserts that as a matter of law, that pursuant to the negotiated agreement, he cannot be compelled to make such *596 payment notwithstanding his ability to pay; further that such payment infringes on his First Amendment and State freedom of religion rights. He does not contest, however, plaintiff's authority as primary residential parent to continue the children's education at the school of her choice.

I.
On April 11, 1991 plaintiff and defendant were divorced. Plaintiff has since remarried; she currently lives with her husband in East Greenwich Township. Under a joint custodial arrangement, plaintiff was designated the primary residential parent of the parties' two children, B.J. and W.J. whose private schooling is now at issue before this court.
As part of the divorce settlement, the parties executed a comprehensive, 30-page, fully negotiated agreement which provided, in part, for defendant's payment of weekly child support of $500 until each child is emancipated[1] and for his payment of his children's private school tuition for the year 1991-1992 as well as conditions upon which such payments would be continued thereafter. The father has made the required monthly tuition payments through the end of the 1991-1992 school year. Defendant now objects to further payment. Plaintiff seeks enforcement. The relevant Agreement provisions relating to child-rearing and education are these:
... 10. CHILD SUPPORT. (a)(2). Husband is currently paying for (B.J.'s) private schooling at King's Christian School, and W.J. will be starting in September, 1991. Husband will be responsible for private school so long as the children are doing well there and both parties agree that they remain in private school, and Husband has to have the ability to pay same. This must be discussed between the parties on an annual basis. Wife shall provide to Husband all information regarding the schooling and the tuition costs prior to Wife committing for same .. .
11. CUSTODY. (a) Legal and Physical Custody. It is the intention of the parties that the parties shall have joint legal custody of the minor children, B.J. and W.J. and Wife shall be primary residential custodial parent. The parties agree *597 that major decisions concerning (B.J.) and (W.J.) regarding the health, education, and general welfare shall be made by the parents jointly, after discussion and consultation with each other, with a view toward obtaining and following a harmonious policy in the child's best interests.
(i) Each party shall keep the other party informed as to the progress of the children's education and social adjustments.
(ii) The parties shall give support to one another in their role as parents, and each shall take into account the views of the other regarding the physical and emotional well-being of the children. The parties shall not attempt to alienate the affections of the children from the other party nor permit any third person to attempt to so alienate the affections of the children from the other party.
(iii) Each party shall notify the other of any activity that could reasonably be expected to be of significant concern to the other.
(iv) Toward that end, the parties agree to consult as necessary to discuss the child's progress. Day-to-day decisions shall be the responsibility of the Wife, who is the parent having physical custody .. .
Presently at issue in this litigation is tuition payment for the school years 1992-1993 and 1993-1994.

* * *
Defendant testifies that in mid-1992 he told his former attorney that he objected to the children's continued attendance. As a former public school graduate he is a firm believer in a public school education. As an agnostic he has had ongoing concerns since the beginning of the children's schooling at King's Christian School because he objects not to their religious training per se, but the mixing of religion in everyday schooling ("I had this opinion all along ... I mistakenly held it inside since day one ..."). He acknowledges that his expressed "views" and the agreement terms are not consistent. He admits that since the 4-11-91 divorce he has not had any discussions with his former wife about the subject of education. While married, he further admits, that he took no steps to enroll either child in public school. His self-recalled, initial and last contact with King's Christian School was two school visits in Jan., 1993: the first for five minutes, unannounced; the second, a week later, for forty-five minutes where he did have an opportunity to hold "... an open-ended discussion with B.J.'s and W.J.'s principal and teachers ..." His last contact with his *598 children was in July, 1992. He has made no requests since for visitation.
Plaintiff testifies that during the marriage the parties lived together in West Deptford Township; that the children had attended a Baptist nursery school for two years and that prior to B.J.'s enrollment in Sept., 1990 plaintiff made a thorough investigation of the West Deptford and King's Christian Schools ("I went to check out accreditation, pupil ratio, etc ... I was impressed ... we both agreed that (B.J.) would go to King's Christian School ..."). She further testified that in May, 1991 she registered W.J. there as well. She can recall no discussion, no complaints from the husband. In July, 1991 she received the 1991-92 tuition coupon book which she gave to the defendant. As before, he paid without complaint, raised no objection to the children's schooling. She saw to it that he got report cards. When the children would visit, they would bring the week's work. His involvement with their children's education, she recalls, was limited to one Saturday afternoon, March, 1992 school open house ("... since the divorce I made efforts to discuss the kids' schooling with him ... I wanted a once-a-month sit down ... he thought that idea was stupid ...").
In summer, 1992 she mailed a new coupon book to the defendant as she was required to do pursuant to ¶ (a)(2) of Section 10 of the marital agreement. He did not reply. Plaintiff first learned of defendant's objection to paying for the 1992-93 tuition through a letter from his counsel. It was not until Jan., 1993 that the defendant personally expressed to her his unwillingness to continue such payments.

* * *
In this family, pre and post divorce, it has been the mother who has investigated, evaluated the children's educational opportunities, who has made, with defendant/father's consent, the appropriate schooling choices. She has been energetically committed to every aspect of their education. She transports them, occasionally with her mother's help, to and from school daily, a 20-minute-plus, *599 one-way car journey. Her desire to see them continue at King's Christian School is not predicated on primarily religious-value issues, but upon her sincere belief that it is here that the children will receive the best education, will be happiest, most productive and most secure.
The court finds that the plaintiff's perceptions are well founded: It appears that both children are educationally thriving, very happy with their school, their teachers and the friends they have made ("... (W.J.) is doing very well in all classes ... a little struggle with reading ... he's now enrolled in a summer reading enrichment program ... he's a wiz at math ... (B.J.'s) report card is all Os ... O's for outstanding ... she is taking drama ...").[2]

* * *
At the post-judgment plenary hearing, each side called one additional witness; the defendant, Douglas Villanova, Principal, Samuel Mickle School, East Greenwich. Mr. Villanova described the expansive curriculum that was available to all public school primary grade students  that would be likewise available to B.J. and W.J. as township residents. It is agreed by all that this public school provides outstanding programming for its students, from those in remedial classes to the gifted and talented. The court was impressed with his testimony in detailing new reading approaches, the school's computer center, its enrichment courses, its large new gym and library, its music and art programming. The court also concludes that the principal's recitation of how the school taught values  i.e. by integrating concepts of friendship, caring, right/wrong, etc. into the curriculum  serves its children well, would serve B.J. and W.J. equally as well if they attended.
The plaintiff's witness was Mrs. Marge Savage, Senior Administrator of King's Christian School, grades K through 12. At the *600 school for 24 years, 17 as an administrator, before that a public school teacher, like Mr. Villanova, she presented as an outstanding, dedicated educator and administrator. Mrs. Savage testified that King's Christian participates in standard national testing, P.S.A.T., S.A.T. programs, is accredited by Middle States Association of College and Schools; likewise, by the State of New Jersey. Divided into two locations, K to 6 & 7 to 12, total student population is 550. She states the average student ratio is 16 to 20 and that of its current graduating class of 29, all but two are going to college. Mrs. Savage further testified that the school faculty must be degreed teachers, state certified; that there is a salary incentive at King's Christian for teachers to pursue Master's degrees; and that 35% to 40% of all teachers have them. Tuition is approximately $2500 per child per year. Mrs. Savage, like Mr. Villanova, gave detailed testimony on the breadth of course curriculum and school facilities. The court concludes that based on the collective testimony, each school offers its students excellent educational opportunities.
The issue of values, how taught, also received considerable attention: Mrs. Savage testified that at King's Christian, the Bible was the basis for the teaching of values, that such values were primarily communicated through everyday course discussion, although there is one Bible study class per day. She testified that most textbooks were secular, that the first mission of the school was education ("... the families in our school represent 160 different church backgrounds ... we don't pretend to be a church, but we do try to teach religious and moral values ...").[3] In her *601 testimony, plaintiff had expressed to the court, that in addition to the quality of the curriculum she thought her children would receive at King's Christian, she believed the school's teaching of Judeo-Christian precepts, interwoven into the daily course study, was of much benefit to her children. It was one reason she was attracted to the school. As noted earlier, this court is convinced that the plaintiff has reached these views based on her own sincere, thorough investigation and evaluation.

II.

THE JOINT CUSTODY AGREEMENT
The public policy of this state is to encourage separated or divorced parents to share the rights and responsibilities of child rearing. Joint custody is one such arrangement requiring "consultation between the parents in making major decisions regarding the child's health, education and general welfare." N.J.S.A. 9:2-4. Though not specifically sanctioned by statute until 1990, our courts have previously held joint custody to be an appropriate remedy in matrimonial custody cases that would apportion between the parents "both equal rights and equal responsibilities regarding the care, nature, education, welfare of their children," that would "... allow both parents full and genuine involvement in the lives of their children following a divorce ..." Beck v. Beck, 86 N.J. 480, 485, 432 A.2d 63 (1981).

* * *
A joint custody agreement, any custody agreement, by necessity also requires a common sense decision-making process sans court that advances the best interests of children, which frees the children from the web of parental deadlock. In that respect, the parties' agreement attempted to do just that by defendant's ceding to plaintiff, as residential custodian, the day-to-day decision-making *602 responsibility. This arrangement seems to reflect the current status of the law, the real-life impracticality of judicial tie-breaking and micro-family management. Cf., Brzozowski v. Brzozowski, 265 N.J. Super. 141, 625 A.2d 597 (Chan.Div. 1993), Pogue v. Pogue, 147 N.J. Super. 61, 370 A.2d 539 (Chan.Div. 1976); Boerger v. Boerger, 26 N.J. Super. 90, 97 A.2d 419 (Chan.Div. 1953).
However, defendant now believes that he has a right to take his acts of acquiescence one step further: He seeks to trade his indifference for his right not to pay or contribute towards his children's private school tuition costs. He asserts, as noted, that a literal reading of ¶ (a)(2) gives him an absolute right not to pay if he so chooses (the children's best interests, his ability to pay, he says, being irrelevant).
When seeking the parties' intent, agreement terms should be read in context to the whole rather than focusing on isolated phrases or paragraphs. Joseph Hilton & Associates, Inc. v. Evans, 201 N.J. Super. 156, p. 171, 492 A.2d 1062 (App.Div. 1985); as to a marital agreement, that certainly means the applicable laws upon which it relies, the equitable principles which supports its enforcement. See, N.J.S.A. 2A:34-23, N.J.S.A. 9:2-4, Lepis v. Lepis, 83 N.J. 139, 416 A.2d 45 (1980), Schlemm v. Schlemm, 31 N.J. 557, 158 A.2d 508 (1960).
As aforementioned, the support component of the parties' agreement requires the defendant to pay all private school tuition through school year 1991-92 and to continue paying it all subject to certain conditions enumerated in ¶ (a)(2) of Section 10 (see, I.). Defendant urges that this provision stands alone not subject to enforcement without his consent. If there were meaningful dialogue and consultation, defendant's argument that ¶ (a)(2) requires "both parents" to agree before he would be obligated to continue to make tuition payments has merit. Clearly this is what the agreement says; absent a showing of fraud, coercion, duress or unconscionability, courts should give great deference to enforcing the bargain made by the parties. Cf., Lepis v. Lepis, supra; Edgerton v. Edgerton, 203 N.J. Super. 160, 171, 496 A.2d 366 *603 (App.Div. 1985) citing Smith v. Smith, 72 N.J. 350, 358, 371 A.2d 1 (1977). "... Consensual arrangements should not be unnecessarily or lightly disturbed ..."
Joint custodial arrangements, such as this one, require as a precondition the willingness to communicate. The law imposes an obligation upon the parties to consult in meaningful, constructive ways, to endeavor to harmonize their views. The parties in Section 11 of their agreement recognize these mutual obligations ("... major decisions ... shall be made by the parents jointly, after discussion and consultation with each other, with a view toward obtaining the following harmonious policy in the child's best interests ..."). Such discussion, this court concludes, is a precondition for ¶ (a)(2) decision-making. See, Joseph Hilton & Associates, Inc. v. Evans, supra. It is uncontradicted that the defendant did none of that. Instead, he had his lawyer send plaintiff a letter declaring his pre-determined decision to discontinue his payment for B.J.'s and W.J.'s education at King's Christian School. His lawyer's letter, in this instance, was an invitation to a lawsuit, not an acceptable substitute for a personal telephone call or any other form of meaningful, civil dialogue that one would or should expect of a parent who insisted upon joint custody.

* * *
In this case, defendant seeks to enforce his right to say "no" by erecting a wall of silence, by cutting off all communication with his former wife, indeed, with his children as well. He relied, instead, on his lawyer to be his surrogate joint custody messenger. This court finds that process inherently flawed and contrary to the prescription of statute which requires divorced parents "to share the rights and responsibilities of child rearing ...", to make provision in joint custody agreements "... for consultation between the parents in making decisions regarding the child's health, education and general welfare . ." N.J.S.A. 9:2-4.
Allowing the defendant to evade, to unilaterally vitiate his statutory and contractual responsibilities to consult, to communicate, *604 to attempt to harmonize differences on behalf of his children  in this instance their education  would be a gross injustice which a Court of Equity should never sanction. Cf., Associated East Mortgage Co. v. Young, 163 N.J. Super. 315, 330, 394 A.2d 899 (Chan.Div. 1978); Brower v. Glen Wild Lake Co., 86 N.J. Super. 341, 350, 206 A.2d 899 (App.Div. 1965), "Equity will not consciously become the instrument of injustice." A Court of Chancery, where such an injustice is evident, must firmly assert its role of parens patriae and enter judgment in accord with such equitable principles as may be required to protect and promote "the best interests" of the children within its jurisdiction. "Best interests" means, among other things, the right of children to be supported, nurtured, educated in accord with the collective available income of both parents, to require parents to keep their promises, to keep their commitments consistent with their ability to do so. Guglielmo v. Guglielmo, 253 N.J. Super. 531, 602 A.2d 741 (App.Div. 1992); Walton v. Visgil, 248 N.J. Super. 642, 591 A.2d 1018 (App.Div. 1991); Zazzo v. Zazzo, 245 N.J. Super. 124, 584 A.2d 281 (App.Div. 1990); Dunne v. Dunne, 209 N.J. Super. 559, 508 A.2d 273 (App.Div. 1986). If one parent is allowed to improvidently close his eyes and wallet to his obligations so as to require the other parent to utilize an added portion of his or her assets or income to fill that void, the children's right to adequate support is effectively diminished. Thus, to the extent that the plaintiff/mother has been forced to expend child support funds for school tuition for years 1992-93 & 1993-94 that otherwise would have been available for other needs, the court must conclude that the "best interests" of B.J. and W.J. have been impaired by the defendant's conduct.

* * *
It is not for the court to conjecture what would have been the end result of such tuition/school discussions if the defendant had fulfilled his obligation to consult after receiving from the plaintiff/mother the payment book for the next school year. According to his own testimony he had in the past, notwithstanding his *605 reservations, conceded such attendance. At the very least, plaintiff had the right to expect, under the terms of the marital agreement, a fair opportunity to dialogue, to convince the defendant, as she did before, that they should both support the children's continued attendance at King's Christian School. She relied upon his word that what he signed he would honor. His ensuing unwillingness to communicate, to consult deprived her of that important, bargained-for right.
A Court of Equity, as a Court of Conscience, cannot be used as a forum to advance or condone wrongdoing. Cf., Sheridan v. Sheridan, 247 N.J. Super. 552, 589 A.2d 1067 (Chan.Div. 1990). Defendant's clear breach of his statutory and contractual obligations, to the detriment of the plaintiff, constitutes such wrongdoing. The equitable doctrines of "Unclean Hands" and equitable estoppel must preclude any relief sought by him, any defense he asserts. Cf., Schmidt v. Schmidt, 220 N.J. Super. 46, 51, 531 A.2d 385 (Chan.Div. 1987), "It is well settled that the equitable maxim  `he who comes into equity must come with clean hands'  applies to matrimonial cases ... the doctrine of `Unclean Hands' gives expression to the equitable principle that a court should not grant relief to a wrongdoer with respect to the subject matter in suit." See also, Goodpasture v. Goodpasture, 115 N.J. Super. 189, 197, 278 A.2d 531 (Chan.Div.) quoting from Flammia v. Maller, 66 N.J. Super. 440, 169 A.2d 488 (App.Div. 1961) holding: "equitable estoppel embodies the doctrine that one may not repudiate an act done or position assumed where the course would work injustice to another who, having the right to do so, relied thereon ...", and Miller v. Miller, 97 N.J. 154, 478 A.2d 351 (1984), where Justice Handler, concurring in part and dissenting in part, eloquently expresses the need for a more expansive application of the doctrine of equitable estoppel where children are involved:
In the matrimonial context, when the rights and interests of innocent children are at stake, we should consider in applying the doctrine of equitable estoppel whether there was a course of conduct that, in its cumulative impact, was tantamount to a representation made by one party with the expectation that other persons would rely on this conduct, and whether, as a natural and probable *606 consequence, such persons did in fact reasonably rely, resulting in a detriment to them. That detriment  the disadvantage or change of position  can occur because of the actor's subsequent repudiation of his or her conduct and disavowal of the expectations engendered by that conduct. Id., at pp. 172, 173, 478 A.2d 351.
Accordingly, the court finds and determines that the defendant shall be required pursuant to ¶ (a)(2) of the marital agreement to pay 100% of the children's tuition for the school year 1992-93. I further conclude, however, that his January, 1993 personal reaffirmation to plaintiff that he would no longer pay the King's Christian School tuition prospectively voids this paragraph. The court must next decide whether, under the facts and law of this case, Section 11 of the agreement, absent ¶ (a)(2), provides a sufficient basis to compel defendant to continue to contribute towards the children's school tuitions.

III.

Constitutional and Public Policy Issues
Defendant argues that any order of this court requiring him to contribute towards tuition costs at King's Christian School constitutes an involuntary support of religion, is an unconstitutional abridgement of his freedom to practice or not practice the faith of his own choosing. He further argues that such an order is not authorized by law and contrary to the public policy of this state. I do not agree.[4]

* * *
A child's education, like other childhood needs  shelter, food, clothing, health, recreation, social, cultural, to name but a few  is an obligation for which parents have been historically held accountable *607 by statute, by Chancery Courts asserting parens patriae powers on behalf of the state. N.J.S.A. 2A:34-23, State v. Perricone, 37 N.J. 463, 475, 181 A.2d 751 (1962) cert. denied. 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962).
Parens patriae  "Parent of the Country"  originates from the English common law as a prerogative of the Crown arising from the Sovereign's duty to protect infants and those of legal disability unable to protect themselves. Borawick v. Barba, 7 N.J. 393, 411, 81 A.2d 766 (1951), dissent at 411, 412, 81 A.2d 766; Black's Law Dictionary, 5th Ed. (1979). The doctrine is oft cited as the fundamental principle guiding our courts in promoting a child's welfare and best interests. In re P, and wife, 114 N.J. Super. 584, 277 A.2d 566 (App.Div. 1971). It is the state's quintessential compact with its citizens, an organic precept of decency of inherent constitutional dimension, as basic and equal to every other constitutional guarantee to which it may be compared. Parens patriae, indeed, is a preeminent promise of human kind, binding one generation to another that those who cannot protect themselves will be protected; that those who need care will receive it; and that the powers of the state, administratively, legislatively, and through its courts, will be utilized to oversee that promise. As it relates specifically to children's issues and the rights of children, parens patriae is the philosophical source of state law, of public policy governing their general welfare, best interests, right of protection, right to be free from harm and abuse. See, N.J.S.A. 2A:34-23 (parental support for children); N.J.S.A. 9:2-2 (removal of children from jurisdiction); N.J.S.A. 9:2-4 (custodial issues; children); N.J.S.A. 9:6-8.8, et seq. (protection of children from abuse and neglect); N.J.S.A 9:6B-1, et. seq. (Child Placement Bill of Rights Act); N.J.S.A. 30:4C-50, et. seq. (Child Placement Review); N.J.S.A. 9:14A-1 (state oversight for children under six who are deaf or hearing impaired); N.J.S.A. 9:14B-1 (county assistance, children with sickle cell anemia); N.J.S.A. 9:3-37 (adoption of children); N.J.S.A. 30:4C-12, et. seq. (Guardianship procedures, termination of parental rights; for protection of children); N.J.S.A. 18A:40-23 (nursing services for children); and as *608 applied, as defined, statutorily and by the common law, parens patriae is the foundation upon which our courts have built a tradition of enforcing parental responsibility, of protection against those, including parents, who seek the judge's imprimatur to infringe or abridge such rights.
In disputes such as this one, parens patriae, when weighed, when balanced, when tested against competing, constitutional principles must prevail. For in a court of equity, a child's best interests and general welfare must always come first. Cf., Holder v. Polanski, 111 N.J. 344, 544 A.2d 852 (1988), Zwernemann v. Kenny, 236 N.J. Super. 1, 563 A.2d 1139 (App.Div. 1989), Murnane v. Murnane, 229 N.J. Super. 520, 552 A.2d 194 (App.Div. 1989) (child's best interest right, preservation of child's relationship with non-custodial parent, state's strong parens patriae concern in promoting child's welfare  predominates over parent's constitutional right of freedom of movement to travel); State v. Perricone, supra, (where evidence presents compelling necessity to protect child's welfare  here blood transfusion to save child's life  state's exercise of parens patriae jurisdiction to allow blood transfusion over parental religious objection not violative of freedom of religion sections of State and Federal Constitutions or due process section of Federal Constitution);[5]Raleigh Fitkin  Paul Morgan Memorial Hosp. v. Anderson, 42 N.J. 421, 201 A.2d 537 (1964), (same blood transfusion protection extended to unborn child); Kelly v. Kelly, 217 N.J. Super. 147, 524 A.2d 1330 (Chan. Div. 1986), (best interests of children to visit non-custodial parent outweighs, does not unconstitutionally infringe upon custodial *609 parent's First Amendment freedom of religion rights; "... any constitutional right a parent has with regard to his or her children, is always subject to the best interests of those children," Id., 157, 524 A.2d 1330); Wagner v. Wagner, 165 N.J. Super. 553, 557, 398 A.2d 918 (1979), (where scheduling conflict exists between child's religious training and visitation, conflict should be resolved to achieve benefit of children's visitation even if religious instruction less than ideal).

* * *
Defendant's First Amendment arguments also fail to differentiate between payments made to a church-sponsored or religiously affiliated school for activities or other child rearing needs which are part of his parental obligations versus payments made directly to these institutions for their support. In this case, he has been paying the King's Christian School, a state-approved school, an annual tuition as an agreed component of his child support obligation; in return the school has been educating his children. He is making such payments on B.J's and W.J's behalf, not his own. To the extent that the children are receiving religious instruction, it is religious instruction consistent with their religious and moral beliefs, as determined appropriate by their mother, the residential parent to whom he, by agreement, has designated their day-to-day oversight (For example: Would defendant make the same argument  and should he prevail  if he is otherwise obligated to contribute to a summer day care or an overnight camp, church-sponsored or church-affiliated?; or in the event of college, should his children be denied his financial support if they choose Notre Dame, St. Joseph's or Southern Methodist, or desire to attend the Princeton Theological Seminary?).
Religious and moral training have been considered an important, positive growth experience in advancing a child's best interests and general welfare by our courts. Brown v. Szakal, 212 N.J. Super. 136, 140 & 141, 514 A.2d 81 (Chan.Div. 1986); but how practiced, how implemented, our courts have held, are best left to the appropriate parent or parents, in this case, the plaintiff *610 mother. Brown v. Szakal, supra, Boerger v. Boerger, 26 N.J. Super. 90, 97 A.2d 419 (Chan.Div. 1953); Wojnarowicz v. Wojnarowicz 48 N.J. Super. 349, 137 A.2d 618 (Chan.Div. 1958). The children's attendance at King's Christian School in no way interferes with defendant's right to believe, to practice a religion or not. In reality, what defendant seeks, by withholding financial support, is the right to superimpose, to force his values on his former wife and children. This he should not be permitted to do.

Public Policy Considerations  Other Jurisdictions
A survey of case holdings from other jurisdictions as to whether or not a non-custodial parent can be required to pay for a child's private schooling finds the debate, pro and con, focused on state policy, not constitutional considerations. Each decision, collectively summarized hereafter, establishes its own criteria, standards or exceptions upon which a trial court, in its sound discretion, can supplement or modify the basic child support award, to add payment by the non-custodial parent for such private education. In all cases the ability to pay is a pre-condition.
In those jurisdictions where the presumption is against compelling contribution, the policy denominator is adequate public schooling ("adequate" defined as appropriate, available programs and services, from special needs students to the gifted). Absent such showing and absent an affirmative demonstration by the residential custodial parent of some other compelling justification or special circumstance, even if that parent by court order or agreement is given the right to designate a private school, the other has no pro rata obligation. Rucks v. Nugent, 191 A.D.2d 786, 594 N.Y.S.2d 379 (1993); Guillory v. Ventre, 610 So.2d 1056 (La. Ct. App. 1992); In re Marriage of Stern, 57 Wash. App. 707, 789 P.2d 807 (1990); Brandt v. Brandt, 92 N.C. App. 438, 374 S.E.2d 663 (1988). Every decision, however, has made clear that there is no per se prohibition against private school attendance, that voluntary agreements will be enforced; some have held that prior agreements to send the children to private school and the religious *611 background of the parties, their children, may be proffered to demonstrate "special circumstance." Rucks v. Nugent, supra; In re Marriage of Stern, supra. The Washington Court of Appeals, while sustaining "the adequate public school" standard, has held, in a case of first impression, that other factors such as family traditions, past attendance by parents, family members at such schools "... may present legitimate reasons to award private tuition expenses in favor of the custodial parent ..." Stern, 789 P.2d at 814.
The above exceptions likewise present as award criteria in jurisdictions requiring the non-custodial parent to make private school payments as a matter of public policy, of law. McGinley-Ellis v. Ellis, 622 N.E.2d 213 (Ind. Ct. App. 1993); Corley v. Corley, 600 So.2d 908 (La. Ct. App. 1992); Hurley v. Hurley v. Von Seckendorff, 610 A.2d 80 (R.I. 1992); In re Marriage of Alexander, 596 N.E.2d 1335 (Ill. App.Ct. 1992); Dempsey v. Stevens,[6] 611 So.2d 815 (La. Ct. App. 1992); Margolin v. Margolin, 796 S.W.2d 38 (Mo. Ct. App. 1990); This court's review indicates the following common factors (1 to 9) as well as many others (10 to 14) relied upon for the entry of such an order. I find that these factors, when applied on a case-by-case basis, form an appropriate standard for review of applications such as plaintiff's:
(1) Ability of non-custodial parent to pay.
(2) Past attendance of one or both parents at that or a similar private school.
(3) Whether children were attending private school pre or post divorce.
(4) Prior agreement of non-custodial parent to pay, to send children to private school.
(5) Religious background of the parties, their children.
(6) Are special educational, psychological and/or special needs of child met, advanced by such private schooling?

*612 (7) Generally, is it in the child's best interest to attend, or to continue to attend, private school (is the academic environment in child's best interest?).
(8) Whether court order or agreement of parties prefers specific right of school choice on residential custodial parent.
(9) Were actions of residential custodial parent to enroll or to continue to enroll the children reasonable under the circumstances?
(10) Is such private school tuition permitted or authorized as part of that state's child support guidelines, or by other law(s)?
(11) Ability of child to respond, prosper from this educational experience; will such schooling be of particular benefit to him or her?
(12) Lack of present, past non-custodial parental involvement in children's education.
(13) Degree of involvement of custodial parent in children's education (is it extensive?).
(14) Is residential custodial parent's views, desires consistent with past practices regarding private school education?
(As to "other factors", see: Dempsey v. Stevens, supra, (10); Margolin v. Margolin, supra, (11); In re Marriage of Alexander, supra, (12-14))

Public Policy Considerations  New Jersey
The one case which seems to sustain defendant's position is Rosenthal v. Rosenthal, 19 N.J. Super. 521, 88 A.2d 655 (1952), modified on other grounds, 26 N.J. Super. 400, 98 A.2d 338 (App. Div. 1953): In a post-divorce judgment proceeding, the father sought to compel the mother, the custodial parent, to allow enrollment of their 13-year old son at a private preparatory academy. The father testified he was financially able and willing to pay the four-year Lawrenceville tuition and to further provide his son with a college education. The mother, however, opposed, insisting that a public school education was adequate; she charged "that the boy's father (was) really attempting to deprive her of her son's companionship ... to weaken her son's affection ... and dependence upon her" Id., 525, 88 A.2d 655. The father denied her claim asserting he was only looking "to do what would be best for his son ..." Id., 525, 88 A.2d 655. The trial judge, at interview, found that the son has a desire to go to a preparatory school, that he hoped to attend college at Massachusetts Institute of Technology upon graduation. The court also found the son to *613 be "intelligent, well-informed, well-mannered and well-spoken ... a credit to both parents, particularly to the mother whose sole custody he (had) been since 1943 ..." Id., 524, 88 A.2d 655. Holding the child's happiness and welfare paramount, and giving weight to the wishes and desires of the child, the court sustained the father's application and modified the decree nisi to permit the son "to take advantage of the generosity of his father ..." Id., 527, 88 A.2d 655. The trial judge stated:
Of course, the father is not required to provide his son with schooling in a private preparatory school nor with college or professional training, nor with any education beyond that which the boy might receive in the public schools of this state. Streitwolf v. Streitwolf, 58 N.J. Eq. 570, at 576 [43 A. 904] (E. & A. 1989); Ziesel v. Ziesel, 93 N.J. Eq. 153 at 157 [115 A. 435] (E. & A. 1921); Straver v. Straver, 26 N.J. Misc.R. 218, at 224 [59 A.2d 39] (Ch. 1948). However, this case does not deal with what the father may be required to do by way of providing his son with an education, but rather with what he voluntarily desires to do at considerable expense for the happiness and future welfare of his son.
In Caruso v. Caruso, 102 N.J. Eq. 393, at 309 [141 A. 16] (Ch. 1928), the late Chancellor Walker said:
"The last duty of parents to their children is that of giving them an education suitable to their station in life, a duty pointed out by reason and of far the greatest important of any." Id., at 526, 88 A.2d 655.
The judge in Rosenthal applied what appears to be a "best interests of the child" standard and in so doing listened carefully, evaluated thoughtfully the views of the child. Even under current standards of parental equality, the deference now given by our courts to residential parental decision-making, the trial court's determination to allow the son to attend private school appears "best interest" appropriate. Rosenthal was obviously decided at a time not as sensitized to compelling the same policy result  i.e., providing an educational opportunity that best serves the child  when confronted with a financially able, but unwilling non-custodial parent. It must be understood, of course, that Rosenthal substantially predates the Supreme Court's holdings in Khalaf v. Khalaf, 58 N.J. 63, 275 A.2d 132 (1971), Newburgh v. Arrigo, 88 N.J. 529, 443 A.2d 1031 (1982) that a financially able parent may be required to pay for his or her child's college education. Likewise, it predates enactment of statute and court guidelines crafted to interact, to advance a common state child support policy which *614 permits the trial court in its sound exercise of discretion to consider, as part of its award, all costs of education at all levels. The extent of these statutory and rule changes post Rosenthal is best described by a review of each:
Pending any matrimonial action brought in this State or elsewhere, or after judgment of divorce or maintenance, whether obtained in this State or elsewhere, the court may make such order as to the alimony or maintenance of the parties, and also as to the care, custody, education and maintenance of the children, or any of them, as the circumstances of the parties and the nature of the case shall render fit, reasonable and just, and require reasonable security for the due observance of such orders, including, but not limited to, the creation of trusts or other security devices, to assure payment of reasonably foreseeable medical and educational expenses.

N.J.S.A. 2A:34-23 [emphasis added]
a. In determining the amount to be paid by a parent for support of the child and the period during which the duty of support is owed, the court in those cases not governed by court rule shall consider, but not be limited to, the following factors:
1. Needs of the child;
2. Standard of living and economic circumstances of each parent;
3. All sources of income and assets of each parent;
4. Earning ability of each parent, including educational background, training, employment skills, work experience, custodial responsibility for children including the cost of providing child care and the length of time and cost of each parent to obtain training or experience for appropriate employment;
5. Need and capacity of the child for education, including higher education;

6. Age and health of the child and each parent;
7. Income, assets and earning ability of the child;
8. Responsibility of the parents for the court-ordered support of others;
9. Reasonable debts and liabilities of each child and parent; and
10. Any other factors the court may deem relevant.

N.J.S.A. 2A:34-23(a) L. 1988, c. 153, § 3. [emphasis added]
RULE 5:6A. CHILD SUPPORT GUIDELINES
The guidelines set forth in Appendix IX of these Rules shall be applied when an application to establish or modify child support is considered by the court. The guidelines may be modified or disregarded by the court only where good cause is shown. Good cause shall consist of a) the considerations set forth in Appendix IX-A, or the presence of other relevant factors which may make the guidelines inapplicable or subject to modification, and b) the fact that injustice would result form the application of the guidelines. In all cases, the determination of good cause shall be within the sound discretion of the court.

*615 NOTE: Adopted May 9, 1986 to be effective immediately; amended November 7, 1988 to be effective January 2, 1989.
Pressler, Current N.J. Court Rules

APPENDIX IX-A OF CHILD SUPPORT GUIDELINES
... (2) Custody Arrangements.
These child support guidelines are intended to be applied to cases having traditional custody and visitation arrangements.
(3) [Factors Not Accounted For.]
These child support guidelines do not take into account the economic impact of the following factors:
(a) spousal support;
(b) equitable distribution of property;
(c) tax consequences;
(d) fixed direct payments;
(e) unreimbursed extraordinary medical/dental expenses for the obligor parent;
(f) educational expenses for the child(ren) or the spouse (i.e., those incurred for private, parochial, or trade schools, other secondary schools, or post-secondary education where there is tuition or other costs beyond state/local tax contributions);
(g) single family units (i.e., one household) having more than six (6) children.
(h) cases involving the voluntary placement of children in foster care ...
Pressler, Current N.J. Court Rules[7] [emphasis added]
* * *
*616 Language of statutes  and likewise rules  should be given their ordinary meaning. Cf., G.E. Solid State v. Director, Taxation Div., 132 N.J. 298, 625 A.2d 468 (1993); State v. Vigilante, 194 N.J. Super. 560, 563, 477 A.2d 429 (Law Div. 1983), (same principles of statutory construction apply to rule construction). Given the plain meaning of each cited statute and rule, I conclude that the public policy of this state in regard to education, as well as all child support components, allows its courts substantial discretion.
Clearly, in the context of this case, the court's focus is not public education v. private, or secular v. religious; the issue is simply this: Based on the proof submitted, which schooling experience best serves the child's needs. To interpret otherwise would be to ignore the precise language of N.J.S.A. 2A:34-23(a)(5) allowing support for all levels of education, "including" college education, Cf., State in Interest of S.Z., 177 N.J. Super. 32 (App.Div. 1981) (words of relation prima facie refer to nearest antecedent), and Court Rule Appendix IX-A(3)(a) i.e., child support guidelines do not take into account economic impact of private, parochial, trade school, secondary school where there are tuition costs (the Family Part Case Information Statement, Part D, Schedule C, Personal Monthly Expenses, includes children's private school costs as part of cost of support or obligation incurred. Pressler, Current N.J. Court Rules, Appendix V). Also see, Louisiana Court of Appeals, 3d Cir., holding that like health/medical costs, cost of private schools is not a deviation from child support guidelines, but is "added to the basic child support obligation" as part of total calculation. Dempsey v. Stevens, supra, 816, 817. As to why in Dempsey, and in this matter, it is obviously so, the rhetorical observations of Justice Lund of the Appellate Court of Illinois, 4th District, in interpreting a statute similar to N.J.S.A. 2A:34-23 perhaps state it best:
... [2] The source of a court's authority to order a noncustodial parent to contribute to a minor child's private school education lies in section 505(a)(2)(d) of the Act, which sets forth the factors which are relevant to a determination of child support. One of those factors is the educational needs of the child. (Ill. Rev. Stat. *617 1991, ch. 40, par. 505(a)(2)(d).) Were it not anticipated that a court could order a noncustodial parent to contribute to the private school education of a minor child, it would be unnecessary in many cases for a court to consider a child's educational needs, since public schools typically involve little cost to parents.
In Re Marriage of Alexander, supra, 173 Ill.Dec. at 458, 596 N.E.2d at 1337.
* * *
Specifically as to the issue of private education, this public policy did not start or end with the amendments to N.J.S.A. 2A:34-23 and the adoption of the child support guidelines. In a series of enactments spanning more than two decades, the Legislature has endorsed a system of primary and secondary education that favorably acknowledges the large numbers of its citizens by reason of family tradition, background or religious belief who have chosen to enroll their children in non-public schools. To this day, to the extent constitutionally permissible, the Legislature continues to demonstrate an ongoing, parallel support for private schools. N.J.S.A. 18A:58-37.1 et. seq. (loan of textbooks to non-public school students, L. 1974, c. 79), further supplemented by Amendment to N.J.S.A. 18A:58-37.5 (L. 1990, c. 52, ¶ 76); N.J.S.A. 18A:46-1 et seq. (compensatory education services for non-public school students, L. 1977, c. 192), further supplemented by Amendment to N.J.S.A. 18A:46-2, L. 1990, c. 52, ¶ 62; N.J.S.A. 18A:46-19.1 et seq. (remedial services for handicapped children in non-public schools, L. 1977, c. 193); N.J.S.A. 18A:39-1 et seq. (transportation aid, non-public school pupils, P.L. 1981, c. 57) further supplemented by L. 1990, c. 52, ¶ 2 & 3;[8]N.J.S.A. 18A:40-23 (nursing services for non-public school pupils, L. 1991, c. 226); N.J.S.A. 18A:40-26 (providing additional medical service and equipment, material and services for immunization for non-public school students, L. 1991, c. 226, ¶ 4).
*618 An excellent example of the Legislature's strong support for non-public schools can be found in N.J.S.A. 18A:58-37.1 et seq., loan of textbooks. In 1971, the Legislature enacted the Nonpublic Elementary and Secondary Education Act (L. 1971, c. 336, N.J.S.A. 18A:58-59, et. seq.) which provided parents of non-public school students reimbursement for the cost of secular textbooks, instructional materials and supplies. The law was challenged and then declared unconstitutional by the United States District Court, District of New Jersey, on April 5, 1973 (see, Public Funds for Public Schools of N.J. v. Marburger, 358 F. Supp. 29 (1973), aff'd, 417 U.S. 961 (1974)). After the District Court decision, new legislation was introduced and by August 5, 1974, N.J.S.A. 18A:58-37.1, loan of textbooks, a successor statute, was signed into law, a reaffirmation to all that the Legislature's policy towards private schools remained unchanged then as it remains unchanged now.[9]

IV.
We live in a pluralistic society, in an age of interfaith marriages which like other marriages end in divorce. Do we adopt as a premise in joint custody disputes that children caught between their parents' idealogical crossfire must remain in a social and moral no-man's-land? I think not. Common sense, common decency  great benchmarks of an equity court  mandate equity's intervention on behalf of these children, to compel their father's support in order that they may continue their education in the warm and productive environment they now enjoy while receiving, as entitled, the full benefit of the collective good fortunes of their *619 parents. Walton v. Visgil, supra. I so hold. I conclude that the defendant is bound by law, by the terms of § 11 of the joint custody agreement, to contribute his pro rata share of tuition.
Life for these children must go on without annual courthouse checkups. As in Brzozowski, for the same compelling reasons, plaintiff/mother must be given like discretion in the future, subject to her obligation to consult with the father. In this case, I find, that she has more than earned that right. Her proofs, when policy-tested, applied to factors relevant to this court's determination, are impressive. She has done an outstanding job. The children are educationally and emotionally thriving. In all aspects of their young lives they are doing very well. Courts should not interrupt such stability and progress. If the King's Christian School receives some incidental benefit by reason of the children's attendance, the law is not offended. Our courts have so held as to incidental benefits received by a custodial parent as a result of a father's fulfilling his child support obligations. Zazzo v. Zazzo, supra, at 131, 584 A.2d 281. Walton v. Visgil, supra, at 650, 591 A.2d 1018. That rationale is equally valid here.

* * *
It is therefore the judgment of this court that defendant shall be entirely responsible for the Kings' Christian School tuition for the year 1992-93, that he shall be obligated to reimburse the plaintiff pro rata for the school year 1993-94. For that purpose, the court will schedule a hearing date to be set for the determination of the defendant's contribution as required pursuant to N.J.S.A. 2A:34-23. Defendant's contribution for the upcoming school year 1994-95 will also be considered. Within 14 days the parties through counsel will exchange and file case information statements with the court. Payment for the 1992-93 school year shall be made by that time. Further discovery, if required, shall be extended for an additional 30 days thereafter.
Counsel for plaintiff shall prepare an order consistent with this opinion.
NOTES
[1] No income information was provided in the agreement. The court assumes that the parties are fully aware of respective incomes and negotiated child support accordingly.
[2] The court's findings are based on mother's uncontradicted testimony. It was stipulated by counsel that there would be no need for confirming interviews with the children. The court, therefore, accepts the mother's testimony as true.
[3] In response to cross-examination, Mrs. Savage did acknowledge one major teaching variable from the public school curriculum: That was in regard to concepts involving the derivation of man. She testified that at King's Christian School, science teachers, while using objective texts (which teaches evolution), present as part of their classroom teaching the concept of "creation" as described in the Bible as the right answer. She agreed that the goal of the school was that each child should come away believing creation as the truth, not evolution. On redirect, it was pointed out  and not contradicted  that other state certified private primary and secondary schools  such as Friend's, Parochial, Mennonite, Hebrew Academy  also may teach subjects from a biblical perspective within and beyond course studies.
[4] During final argument an issue was raised by defense counsel questioning the potential unconstitutionality of the child support guidelines (R. 5:6A, Appendix IX A) and statute (N.J.S.A. 2A:34-23(a)) as these might relate to defendant's First Amendment, freedom of religion rights in this case. The court continued argument to allow the Office of Attorney General and counsel for the Administrative Director of Courts an opportunity to intervene (see R. 4:28-4). Both declined.
[5] N.J. Constitution of 1947 provides the following rights of conscience and religious freedom guarantees: No person shall be deprived of the inestimable privilege of worshiping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatever be compelled to attend any place of worship contrary to his faith and judgment; nor shall any person be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right or has deliberately and voluntarily engaged to perform. N.J.S.A. Const. Art. 1, § 3.
[6] The status of this issue in La. remains unsettled. In Guillory v. Ventre, supra, a decision cited among those cases favoring a presumptive policy of public school education, a contrary result was reached in the same La. Appellate District as Dempsey.
[7] Pursuant to Federal mandate each state was required to establish one set of guidelines by law or by judicial or administrative action for the setting of child support awards. 42 U.S.C.A. § 667, Code of Federal Regulations, Title 45, Public Welfare § 302.56 (1985). As noted, N.J. delegated as its respondent, its Supreme Court, electing to implement its child support guidelines by judicial rule rather than by law or executive rule-making. However, the intent of the Legislature and the Supreme Court to assure that there would be a common policy linkage  i.e., that statute and rule would operate in tandem  is evident (see, N.J.S.A. 2A:34-23(a) requiring court in child support cases not governed by Rule to consider factors therein; and corollary statement in Appendix IX-A, ¶ (1)(B) requiring that that portion of child support ordered calculated on amounts of net combined family income over $52,000 be based on factors enumerated in N.J.S.A. 2A:34-23, Pressler, N.J. Court Rules). Effective Oct. 13, 1989, the Federal government further mandated that the guidelines be also utilized for child support modifications. As before, each state plan could incorporate, subject to Federal approval, additional child support criteria and standards. Id. § 302.56 (1989).
[8] Prior to 1981, by statute, case law, transportation of non-public school students along established public school bus routes long held constitutionally permissible. See, Board of Ed. of Central Regional High School Dist. of Ocean County v. State Bd. of Ed., 27 N.J. 76, 141 A.2d 542 (1958).
[9] The Quality Education Act of 1990 (N.J.S.A. 18A:7D-1 et seq.) finally repealed the Non-Public Elementary & Secondary Education Act (N.J.S.A. 18A:58-59 et. seq.). While this statute, as noted, has been succeeded by N.J.S.A. 18A:58-37.1, loan of textbooks, its legislative findings provide insight into current state public policy underlying support for non-public schools (see, N.J.S.A. 18A:58-60 expressing legislative sentiment that parents who in the "exercise of their constitutional rights ... choose non-public education (for their children) make a major contribution to the public welfare ..." Id.; that if such private schools did not exist, intolerable public tax and education burdens would result).