879 A.2d 138 (2005)
379 N.J. Super. 400
Megan D. GROVER, Plaintiff-Respondent,
v.
Marvin TERLAJE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued April 19, 2005.
Decided August 4, 2005.
*139 Jane A. Herchenroder, Newark, argued the cause for appellant.
Kathryn Trenner, Princeton, argued the cause for respondent.
Before Judges STERN, COBURN and WECKER.
The opinion of the court was delivered by
STERN, P.J.A.D.
The principal issue on this appeal relates to the impact of a final restraining order on a father's request for the joint legal custody of his six-year old son.
Defendant appeals from provisions of an amended final restraining order (FRO) entered on June 14, 2004, which denied his request for "joint legal custody" of the parties' son, Shawn; awarded "plaintiff permanent sole legal and residential custody"; granted plaintiff authority to make all decisions concerning Shawn's medical and *140 educational needs, but required plaintiff to "provide Defendant full and complete information about Shawn's school and extracurricular activities"; denied defendant's request to be joint custodian "for all accounts and economic holdings" for the benefit of Shawn; and denied defendant's request that he be able to consider Shawn as his dependent for tax purposes until plaintiff makes an annual income of $25,000 or more. The order also denied defendant's request to "amend the FRO to provide for telephone communication between the parties for purposes of discussing issues regarding Shawn," but did amend the FRO "to permit Defendant to have non-harassing communication with Plaintiff by telephone or e-mail concerning parenting issues regarding Shawn only." Parenting time and child support issues and scheduling details were also resolved on the parties' cross-motions, and defendant was granted liberal visitation during the week, every other weekend and on holidays.
After entry of the order under review, the parties entered a post-judgment agreement on some issues, thereby narrowing the dispute. Shawn was six years of age at the time of the hearing, and the amount of parenting time is not being challenged on the appeal.
The unmarried parties lived together until Shawn was three years old, and joint legal custody might well be appropriate if there were no FRO. However, the record reflects the entry of an FRO on August 23, 2001. It granted plaintiff "temporary child custody" of Shawn. The record also reflects that on February 15, 2002, defendant was placed on probation for three years for possession of a weapon for unlawful purposes and the petty disorderly persons offense of harassment, apparently stemming from the same incident, and that he "successfully completed the `Options Anger Management Program' at Richard Hall Community Mental Health Center." As a result of the satisfaction of "[a]ll conditions of probation," including the payment "in full of all" financial assessments and remaining "arrest-free," defendant was discharged from probation on October 6, 2003.
Little else is known about the reasons for the FRO or the underlying events. Defendant provided no record of the prior proceedings in support of his application to obtain joint legal custody and more involvement in his son's life.[1] In his certification in support of his motion to amend the FRO, defendant certified:
1. I am the Defendant in the within matter and am making this Certification in support of my Motion to be awarded joint legal custody of my son, to recalculate my child support obligation to him, to have more liberal and overnight parenting-time with him, as well as other relief. By way of background, the Plaintiff and I were never married but have a son together, Shawn V. Terlaje, born April 25, 1998 who is the subject of this motion.
2. At the time of my son's birth, I was living with the Plaintiff and saw my son on a daily basis for the first three years of his life. Unfortunately, the Plaintiff and I broke up in 2001 and I moved out of our townhouse. Almost immediately, the Plaintiff's new boyfriend moved in with her and seemed to usurp the role of father in my son's life. I was extremely upset by this turn of events and I, unfortunately, let my emotions get the better of me. I had an *141 altercation with the new boyfriend and, as a result, the Plaintiff got a Final Restraining Order against me and I was charged with aggravated Assault. I was given one year of Probation and was required to attend an Anger Management Program.
3. Although I successfully completed and passed the course, the Plaintiff has severely limited my contact with my son ever since that time and has even gone so far as to suggest that she be awarded sole legal and physical custody of my son. Despite that one incident almost three years ago, I have been a very loving, caring and concerned father to my son. I have tried on many occasions to negotiate more parenting-time with him, but the Plaintiff has denied me that right; she has steadfastly maintained the schedule set forth in the FRO which provides me with parenting-time on Sundays from 9:00 a.m. until 5:00 p.m. My son just turned 6 years old and I believe that it is in his best interests to spend more time with me and my family. I am, therefore, proposing parenting-time every other weekend from Friday afternoon until Sunday evening with a week-night evening dinner visit on a night that is mutually convenient for both me and the Plaintiff. I am, therefore, respectfully requesting that the court award me joint legal custody of Shawn and the rather modest parenting-time schedule I have proposed above.
4. Shawn will be well-loved and taken care of while he is in my care and the Plaintiff has absolutely nothing to fear. I would never, ever place my child in harm's way and my having more time with him will only be of great benefit to him. I am currently living with my parents in Montgomery Township and we have a separate bedroom set aside just for Shawn. He would also be able to spend time with, and get to know, his paternal grandparents. Of course, he already knows my parents, but, since my time with Shawn is so limited, it has been hard for any of us to develop a really close and strong bond with him. At this age, I believe it is essential for a young boy to know and develop a strong relationship with his father. I am actively involved with my son's extracurricular baseball team, but would like more extended time with him. There is absolutely no reason why I should not be afforded overnights with Shawn. I made a mistake 3-years ago and I have learned my lesson. But, I should not have to continue paying for that one mistaken forever at the expense of my son.
In response and in support of her cross-motion, including an application "[a]warding permanent sole legal and residential custody of Shawn Terlaje to plaintiff" and for an order establishing defendant's parenting time and responsibilities, plaintiff certified:
3. Defendant and I met at Montgomery High School and were never married, but cohabited for 7 years, separating in June of 2001 when Defendant moved out. I had lived with his erratic mood swings for 7 years. Defendant would have fits of anger  often many times each day. He was like a loose cannon. His behavior was inconsistent: most of the time he would be very nice  and then he would lose it and become agitated, enraged, mean, aggressive, and threatening. I thought he must be using drugs which only exasperated [sic] his underlying instability after I found drug equiptment [sic] among his possessions when I packed his remaining things for him. During the 3 years since we separated, I have heard rumors in our community that he has lost his temper and engaged in assault type activities. *142 Defendant lives with his parents and hangs out with a large group of singles some of whom I know use illegal drugs. This is not a healthy environment for a 6 year old boy.
4. In August of 2001 a domestic violence order (EXHIBIT A) was entered restraining Defendant from having contact with me after Defendant put me in fear for my life when he came uninvited to a party at my residence at 2 a[.]m[.], held a knife to my throat, demolished my kitchen, and ranted and raved until the police arrived. As a result, on February 15, 2002, Defendant was convicted of possession of a weapon for unlawful purpose and harassment. EXHIBIT B.
5. To this day I have a strong fear of Defendant's outbursts of anger. I know that Defendant participated in the Court's Anger Management Program and Substance Abuse Program  but Defendant still exhibits the same agitation and scary behavior. Our little boy has frequently described his father's actions toward him as "mean" and "angry" and says that "no one knows that he is mean to me." After such events, our 6 year old will refuse to spend time with his father for a while. He will say that he "wants to see Daddy when he is in a good mood."
. . . .
21. I ask the Court to award me permanent and sole legal and residential custody as the Parent of Primary Residence.
22. I must STRONGLY OPPOSE Defendant's request for any form of joint custody  legal or residential. There is a restraining order in effect  which [I] want to remain in place. Defendant and I do not get along. He had a knife at my throat in August 2001 and still exhibits the same agitated and scary behavior[.]
23. Shawn loves his father very much and I want them to build their relationship, but our son is also being hurt by his father's mood swings and frequent agitated, aggressive, threatening, verbally/physically violent, and mean behavior. Shawn is only just 6.
In New Jersey joint "legal custody" is favored, while joint "physical custody" is "rare." Pascale v. Pascale, 140 N.J. 583, 596-97, 660 A.2d 485 (1995). "Joint legal custody" is the "authority and responsibility for making `major' decisions regarding the child's welfare," id. at 596, 660 A.2d 485, although "the parent who acts as the `primary caretaker' for the children after divorce should retain authority over the child support that both parents provide." Id. at 611, 660 A.2d 485. In fact, joint legal custody is "the preferred arrangement since it `is likely to foster the best interests of the child in the proper case.'" Nufrio v. Nufrio, 341 N.J.Super. 548, 555, 775 A.2d 637 (App.Div.2001) (quoting Beck v. Beck, 86 N.J. 480, 488, 432 A.2d 63 (1981)). "`Joint physical custody' means joint `responsibil[ity] for `minor' day-to-day decisions' and the exertion of continuous physical custody by both parents over a child for significant periods of time." Pascale, supra, 140 N.J. at 596, 660 A.2d 485 (quoting Beck, supra, 86 N.J. at 487, 432 A.2d 63). See also N.J.S.A. 9:2-4(a)(b)(c).
In determining issues of custody, "the rights of both parents shall be equal," and
[i]n making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and *143 siblings; the history of domestic violence, if any; the safety of child and the safety of either parent from physical abuse by the other parent; . . . the stability of the home environment offered. . . the fitness of the parents . . . A parent shall not be deemed unfit unless the parents' conduct has a substantial adverse effect on the child.
[N.J.S.A. 9:2-4 (emphasis added).]
As the Supreme Court has said in Beck, supra, 86 N.J. at 498-99, 432 A.2d 63, while emphasizing that "the best interests of the child is [the] polestar:"
The most troublesome aspect of a joint custody decree is the additional requirement that the parent exhibit a potential for cooperation in matters of child rearing. This feature does not translate into a requirement that the parents have an amicable relationship. Although such a positive relationship is preferable, a successful joint legal custody arrangement requires only that the parents be able to isolate their personal conflicts from their roles as parents and that the children be spared whatever resentments and rancor the parents may harbor. . . . [t]he judge must look for the parents' ability to cooperate and if the potential exists, encourage its activation by instructing the parents on what is expected of them.
In this setting, we conclude that the presumption in favor of awarding custody to "the non-abusive spouse" embodied in N.J.S.A. 2C:25-29b(11) relates to legal as well as physical custody, although the presumption weakens as time passes without any conduct which can be said to jeopardize the "non-abusive spouse" or the child.[2] In Nufrio v. Nufrio, 341 N.J.Super. 548, 775 A.2d 637 (App.Div.2001), where there were "several municipal court and domestic violence charges," we affirmed provisions of "the final judgment of divorce" granting "sole custody" to the mother, and noted that "the type of custody arrangement [is left] to the sound discretion of the trial court," Nufrio, supra, 341 N.J.Super. at 555, 775 A.2d 637, quoting Pascale, supra, 140 N.J. at 611, 660 A.2d 485. However, we also noted "that the judgment of divorce does state that defendant may `make an application for joint legal custody after the child completes second grade at which time the Court will review the parties' ability to communicate and cooperate during the prior time period.'" Ibid.
Here, defendant does not claim the FRO should be vacated or that he has shown enough to warrant its complete vacation. He seeks only joint legal custody and the related ability to participate in decision making relating to his son. However, we have been presented with no transcript of the prior proceedings, although we have said that:
[w]ithout the benefit of the final hearing transcript, the motion judge was unable to fully consider those arguments [in support of dissolution of the FRO]. We note N.J.S.A. 2C:25-29a prohibits entry of a final restraining order without a finding or an admission by defendant that an act of domestic violence was committed. Precisely what occurred at the final hearing remains a mystery. The failure of defendant to provide the motion judge with a complete record to consider is fatal to his appeal. Whether a review of the transcript would have *144 made a difference in the result, or led to a plenary hearing, is not known.
In addition to the complete record of the earlier proceeding, the motion judge must consider whether the moving party has established "good cause" to dissolve the restraints. We are in accord with the factor-analysis approach to an application for dismissal of a final restraining order set out in the well-reasoned opinion of Judge Dilts in Carfagno v. Carfagno, 288 N.J.Super. 424, 672 A.2d 751 (Ch.Div.1995). Judge Dilts set forth a non-exclusive list of factors to be considered by the court in determining whether the moving party has shown "good cause" sufficient to warrant dismissal of the final restraining order. Carfagno, at 435, 672 A.2d 751. We add, for emphasis, that the previous history of domestic violence between the parties must be fully explored and considered to understand the totality of the circumstances of the relationship and to fully evaluate the reasonableness of the victim's continued fear of the perpetrator. See N.J.S.A. 2C:25-29a(1); Cesare, 154 N.J. at 403, 713 A.2d at 394; [State v. ]Hoffman, 149 N.J. [564] at 585, 695 A.2d 236 [1997]. This may include exploration of incidents that were not testified to at the final hearing. Domestic violence cases are often handled expeditiously, without the formality of counsel, and in an informal manner. Maksuta v. Higson, 242 N.J.Super. 452, 454, 577 A.2d 185 (App.Div.1990). This is especially true where there is consent to the allegations of the complaint or the matter is uncontested. For example, where there is a stipulation by defendant an act of domestic violence was committed, and the final order is entered, often prior acts of domestic violence are not mentioned or even considered. However, upon a later application for dismissal of that order, inquiry into the history of the relationship and prior acts of domestic violence become important to consider in evaluating the necessity for continued protection.
In analyzing the dismissal application in Carfagno, Judge Dilts conducted a plenary hearing. We emphasize that not every motion for dissolution of a domestic violence restraining order requires a plenary hearing. In Carfagno a plenary hearing was needed to resolve factual disputes on the issue of whether defendant violated the restraining order since its issuance. We are in accord with the reasoning of Judge Escala in M.V. v. J.R.G., 312 N.J. Super. 597, 599-600, 711 A.2d 1379 (Ch.Div.[1997] 1998), that the moving party has the burden to make a prima facie showing good cause exists for dissolution of the restraining order prior to the judge fully considering the application for dismissal. If that burden is met, the court should then determine whether there are facts in dispute material to a resolution of the motion prior to ordering a plenary hearing. Conclusory allegations should be disregarded. See Lepis v. Lepis, 83 N.J. 139, 159, 416 A.2d 45 (1980).
[Kanaszka v. Kunen, 313 N.J.Super. 600, 607-608, 713 A.2d 565 (App.Div.1998).]
Even though defendant does not seek to dissolve the FRO, and only seeks to modify its provisions concerning custody, the same principles apply. The joint legal custodians must be able to communicate about the child, and here the DV order was amended to improve that communication. While three years have passed since the original FRO was entered, the experience under the amended FRO has not been developed; only two and-one-quarter years had passed since the time defendant was placed on probation, and only eight months elapsed following his discharge therefrom. *145 The record before us does not suggest that the trial judge has abused his discretion in not further amending the order. See Cesare v. Cesare, 154 N.J. 394, 413, 713 A.2d 390 (1998) (deference must be given to special expertise of the Family Part). Moreover, defendant did not request a plenary hearing, although he now "asserts that his request for joint legal custody should not have been denied absent a hearing on this request."
In any event
[t]he key element here is the character or quality of the parent-child relationship. . . Moreover, when seeking joint custody after an initial custody determination has been made, even a parent enjoying such a relationship must satisfy the same burden of proof as applies to anyone seeking to change a custody decree, namely, a change of circumstances warranting modification.
[Beck, supra, 86 N.J. at 496, 432 A.2d 63.]
See also Kanaszka, supra, 313 N.J.Super. at 608-09, 713 A.2d 565 (requiring a showing of "substantial changed circumstances" since entry of the FRO).
The changed circumstances concept does not necessarily warrant a change in joint legal custody all at once. The best interests of the child warrant an evaluation of the progress made in terms of the abuser's ability to establish a more normal relationship with the physical custodian as well as the relationship with the child and recognition that the presumption becomes less significant as time passes. Stated differently, the presumption must be analyzed in the context of the totality of circumstances including the nature of the DV act committed, and the basis for the FRO along with the post-judgment circumstances, including the time that has passed, the conduct of the abuser after entry of the FRO and any amendments permitting contact with respect to the child and the abused parent, and the relationship with the child during the increased visitation.
The record before us warrants the amendment entered, and defendant can seek further amendments based on the circumstances as they hereinafter further develop. We add, however, that the statutes dealing with custody, both in the domestic violence setting and otherwise, do not refer to "permanent" custody because custody is always subject to consideration of the "best interests" of the child. See N.J.S.A. 9:2-4; N.J.S.A. 2C:25-29b(11); see also, e.g., Sacharow v. Sacharow, 177 N.J. 62, 80, 826 A.2d 710 (2003); Matsumoto v. Matsumoto, 171 N.J. 110, 132-34, 792 A.2d 1222 (2002) (custody issue is an exception to fugitive disentitlement doctrine otherwise prohibiting appeal). The reference to the award of sole "permanent" custody must be understood in this context.
We need not comment on any other related issue raised by defendant. R. 2:11-3(e)(1)(E). With respect to the tax exemption for the dependent child, see Gwodz v. Gwodz, 234 N.J.Super. 56, 61-63, 560 A.2d 85 (App.Div.1989).
The order is affirmed.
NOTES
[1] He attached, as exhibit A to the certification in support of his motion, two pages of the transcript of the August 23, 2001 proceedings which he said were "the only pages relevant to child support."
[2] Upon a showing of domestic violence, N.J.S.A. 2C:25-29b(11) permits the Family Part to enter "[a]n order awarding temporary custody of a minor child." "The court shall presume that the best interests of the child are served by an award of custody to the non-abusive parent." N.J.S.A. 2C:25-29b(11).