101 A.3d 1132

C. MADISON,[1] PLAINTIFF, v. W. DAVIS, DEFENDANT.

Superior Court of New Jersey
Chancery Division, Family Part
Ocean County

Decided June 18, 2014.

---

[1] The court, in its discretion, utilizes initials and pseudonyms in place of the child's and parties' actual names.

24

26

*Jef Henninger,* for plaintiff.

*John A. Patti,* for defendant.

L.R. JONES, J.S.C.

This case presents legal issues of first impression regarding the rights and obligations of divorced parents when their child attends pre-school.

## FACTUAL BACKGROUND

Plaintiff and defendant divorced in 2013, following a four-year marriage and another year of contentious litigation. In a written matrimonial settlement agreement, the parties agreed to share joint legal custody of their three-year-old child, L.D., with plaintiff serving as primary residential custodian.

At the time of divorce, both parties were working, and the child was attending work-related day care at a particular pre-school (hereinafter referenced as "Pre–School A"). The parties agreed to equally share the cost of future work-related childcare, and to mutually cooperate, in advising the day care facility to mail copies of bills and progress reports, if any, to both parties. The document, however, contained no express or implied agreement that plaintiff was obligated to permanently utilize the same day care provider. Nor were there any stipulated restrictions, limitations, or restraints against plaintiff, as the child's primary caretaker, electing to change day care providers in the future at her discretion. To the contrary, the settlement agreement explicitly provided that defendant's name would be added as an emergency contact at "*any* school and/or day care provider" (emphasis supplied), and that each party would provide the other party with copies of any communication to the day care provider as applicable.

In the agreement, the parties further concurred that "once the child is of school age," defendant would be authorized to obtain all information from the school regarding the child's progress, and that the parties would instruct the school to send information about the child to both parents.

Less than four months after settling their divorce litigation, the parties commenced brand new, post-judgment litigation. The issue involved plaintiff's decision to change the child's day care provider from Pre-school A to a new pre-school (hereinafter referenced as "Pre-school B"), which was of relatively similar cost and location. Plaintiff contended that the reason she wanted to switch providers was that Pre-school B offered seasonal swimming classes and preferential enrollment in such classes for attending students. Defendant, however, objected to plaintiff's decision, arguing that the real reason plaintiff wanted to switch pre-schools was because of a personal issue she had with the actions of the director of Pre-school A, who had allowed defendant to sign the child out of the pre-school on one occasion without plaintiff's prior knowledge and consent.[2] In short, a legal dispute erupted over the comparative rights of each parent to decide which pre-school their child should attend.

Asserting that plaintiff violated defendant's parental rights by switching L.D.'s preschool without his prior authorization, defendant brings the present motion seeking a court order compelling plaintiff to immediately reinstate the child at Pre-school A, and to restrain plaintiff from moving the child to any other pre-school without his consent. The essential thrust of defendant's legal argument is threefold: (a) "joint legal custody" grants the parties equal rights on educational issues; (b) pre-school attendance is in fact an educational issue which defendant has an equal right to determine; (c) plaintiff therefore violated defendant's legal rights by changing the child's pre-school without his express authorization and consent.[3] Defendant contends that any decision by

---

[2] Without delving into specific details, Pre-school A's actions were ultimately the subject of an investigation by the New Jersey State Office of Licensing, Child Care and Youth Residential Licensing, which substantiated the center's violation of certain requirements set forth in the manual of requirements for childcare centers.

[3] Defendant has sought other post-judgment relief as well, which is outside the scope of this opinion.

plaintiff to change pre-schools should have been made jointly with him and only with his prior approval, "as if they are husband and wife making decisions as a family unit." Defendant's legal argument rests upon principles set forth in the landmark New Jersey Supreme Court case of *Beck v. Beck,* 86 *N.J.* 480, 485, 432 *A.*2d 63 (1981), which supports the concept of parents sharing joint legal custody under *N.J.S.A.* 9:2–4 and having "equal rights and equal responsibilities regarding the care, nurture, education and welfare of their children."

Reciprocally, plaintiff contends that defendant is unreasonably interpreting the terms and spirit of both their settlement agreement, and *Beck,* in an improperly restrictive fashion. While not contesting the principle that legal custody generally contemplates joint decisionmaking on major educational issues, plaintiff argues that this concept is intended to apply to significant scholastic issues once the child reaches school age and begins attending class in regular education program (i.e., kindergarten through twelfth grade, or beyond if college is an issue). Plaintiff urges that this principle does not, and cannot, reasonably apply to limit a primary residential custodian's ability to select or change a day care provider, albeit one with a discretionary pre-school component, as same is not a major educational decision requiring defendant's joint permission and consent. Plaintiff further points out that the divorce agreement expressly couches other education-related provisions in the future tense, i.e., what happens *"once the child is of school age "* (emphasis supplied), thereby reflecting the parties' true understanding that work-related day care and pre-school attendance simply does not require the same level of analysis and joint parental approach as does selection of a full-time school upon the child attaining legal school age.

Plaintiff stresses that, notwithstanding *Beck,* she as primary residential custodian has the general right to select L.D.'s day care provider. Her argument relies upon legal principles set forth and espoused in yet another landmark New Jersey Supreme Court case, *Pascale v. Pascale,* 140 *N.J.* 583, 599–600, 660 *A.*2d

485 (1995). *Pascale* notes that the primary residential custodian is generally in charge of many aspects of a child's life, including "arranging alternative care, i.e., babysitting or day care." *Id.* at 600, 660 *A.*2d 485. *Pascale* further holds that the child's primary caretaker needs autonomy to make day to day decisions and utilize financial resources drawn from both parents' salaries (i.e., his/her own income), plus child support from the non-custodial parent, in order to effectuate such decisions "without endless discussion with the secondary caretaker." *Id.* at 600, 660 *A.*2d 485.[4] *Pascale* further states that in a joint legal custodial relationship, the residential custodial parent "is afforded somewhat more authority to decide issues in the event of a disagreement, and may discharge such responsibilities subject to notification to, and dialogue with, the non-custodial parent who also has joint legal custody." *Id.* at 606, 660 *A.*2d 485. Based upon these general principles in *Pascale*, plaintiff concludes that that she has the authority to switch the child's pre-school (i.e., day care provider) provider, with or without defendant's prior approval.

After considering each party's legal position and the very thorough competing arguments of respective counsel, the court renders the following resolution of this matter.

### LEGAL ANALYSIS: BECK v. PASCALE

At first glance, this case appears to present a potential clash of very important policies set forth in the two equally compelling Supreme Court cases of *Beck* and *Pascale*, opinions which are respectively and regularly championed by non-custodial parents (*Beck*) and primary residential custodians (*Pascale*) for opposite

---

[4] *Pascale* follows up on the similar concepts set forth in an opinion published a year earlier in *Hoefers v. Jones*, 288 *N.J.Super.* 590, 601–02, 672 *A.*2d 1299 (Ch.Div.1994), wherein the trial court noted that joint custody by necessity requires an out-of-court common sense decision-making process which advances the child's best interests, while freeing the child "from the web of parental deadlock." *Ibid. Hoefers* further holds that the primary residential custodian must generally have day-to-day decision-making responsibility, in order to avoid "the real-life impracticality of judicial tie-breaking and micro-family management." *Id.* at 602, 672 *A.*2d 1299.

reasons. *Beck* provides significant legal support for the rights of a non-custodial parent to serve as a joint legal custodian and to participate in important child-rearing decisions. Conversely, *Pascale* provides significant legal support for the rights of a primary residential custodian to exercise parental discretion and authority on many child-rearing issues without having to first secure pre-approval and consent of the non-custodial parent.

After carefully reading and analyzing both cases, this court notes that neither *Beck* nor *Pascale* deals in any specific way with factual circumstances and legal questions concerning pre-school, and each parent's respective rights and obligations stemming from a child's enrollment or attendance in such a program. Accordingly, it is problematic to adequately address the legal issues in this case by simply lifting generic principles out of either *Beck* or *Pascale* and pasting them into the context of this litigation as a method of reaching a simple and definitive conclusion. Rather, principles of law arising from precedential court opinions must be considered in the context of the facts which are before the court issuing the decision. *See McKinley v. Naters*, 419 *N.J.Super.* 205, 211, 16 *A.*3d 479 (Ch.Div.2010).

In *Beck*, the court does not state that every decision involving any remote connection to a child's formal or informal education, including pre-school, must be made jointly by divorced parents. Nor does *Beck* hold that a non-custodial parent who disagrees with a residential custodian's pre-school selection has automatic veto power over the decision, or that the non-custodial parent can legally prevent a residential custodian from switching day care providers or pre-schools by simply refusing to consent to a change in placement. Reciprocally, *Pascale* does not specifically address pre-school either. Rather, the court's discussion of day care is offered as one example of a residential custodian's many traditional functions. Moreover, *Pascale* does not address additional educational considerations which may exist when a child's day care provider simultaneously doubles as a child's pre-school and educational provider. Nor does *Pascale* hold that a primary residen-

tial custodian is free to unilaterally and arbitrarily change a child's existing pre-school program for any reason whatsoever, without notice to the other parent, and without regard to any impact such decision might have on the child or the other parent.

Thus, while the general principles of both *Beck* and *Pascale* serve as appropriate legal background in this case, the reality is that the issue of parental rights and obligations relating to a child's attendance at pre-school is novel. Hence, the court must analyze the present dispute with not only due consideration of the principles in *Beck* and *Pascale*, but with additional application of fairness, logic, and practical common sense. By applying such principles, the court finds that both parties in this case have meritorious positions regarding their respective rights, and the most equitable result is a hybrid one, which considers and respects these comparative rights by rolling the principles of *Beck* and *Pascale* into one.

## PRE–SCHOOL: A CROSS–BETWEEN DAY CARE AND SCHOOL

Initially, the court notes that in these highly challenging economic times, many families with young children have two working parents, resulting in the necessity for ongoing work-related day care. This circumstance occurs both in intact families, and in families fractured by divorce. As previously referenced, *Pascale* notes that in the latter circumstance, the primary residential custodian generally is in charge of making day care arrangements for the child. *See Pascale, supra,* 140 *N.J.* at 598–99, 660 *A.2d* 485.[5] Further, New Jersey's Child Support Guidelines pro-

---

[5] When the primary residential custodian selects a regular ongoing day care provider or babysitter, it is logical and appropriate for the parent to share this information with the non-custodial parent, who in most cases has the right to know who is watching his or her child, and where, in case of emergency or otherwise, absent a restraining order or other similar compelling legal reason requiring confidentiality of the parent and child's location and related information.

vide that in cases of separation or divorce, both parents may be responsible for the cost of work-related day care, and the non-custodial parent's portion of such expense may be added onto his or her basic child support obligation. Child Support Guidelines, Pressler & Verniero, *Current N.J. Court Rules,* Appendix IX–A to *R.* 5:6A at p. 2586–87 (2014).

Pursuant to *N.J.R.E.* 201(b) the court takes judicial notice, as a matter of common knowledge, that millions of working parents utilize pre-school programs for the purpose of providing work-related day care services for their children. In many respects, the days of leaving a child all day with the kindly neighborhood babysitter are slowly vanishing. In its place, combined day care/pre-school centers are rapidly appearing on the public landscape, and simultaneously serve two very important but very distinct purposes. The first purpose is to provide the child with a responsible caretaker (i.e., "day care") during employment hours so the parents can go to work, earn their livings, and accumulate money to financially support themselves as well as the child. The second purpose is to provide the child with meaningful educational value during these hours, as opposed to the child simply sitting in front of a television set or computer game all day long, waiting for a caretaking parent to come home.

The benefits of pre-school for a young child can be substantial from both an academic and social standpoint. Intellectually, a child who attends pre-school has the opportunity for an early academic introduction to important and enlightening subjects such as math, science, social studies, and the arts. Socially, a child may gain valuable experience on how to function in a group setting with same-age peers outside the four walls of his or her home. Further, a child may learn about concepts such as responsibility, politeness, patience, and friendship with other children from multiple diverse backgrounds. This knowledge and experience can be very beneficial to a child when he or she ultimately transitions into kindergarten for the start of formal schooling. For these reasons, even parents who have no work-related day care needs may

voluntarily choose to place their children in a reputable pre-school program, primarily if not exclusively for the educational and social benefits which attendance may bring.

With the rising popularity and proliferation of pre-school programs, many parents believe that a child who does not attend a pre-school program may be at a substantial disadvantage when the time comes to commence formal schooling. That being stated, preschool attendance is generally not a mandatory legal requirement in this state.[6] To the contrary, New Jersey requires school attendance, or its educational equivalent, for children between the ages of six and sixteen. *N.J.S.A.* 18A:38–25. Moreover, there is an insufficient basis for the court to summarily conclude, without more evidence, that (a) a child who does not attend pre-school is at an immediate, substantial irreparable, and irreversible disadvantage when he or she attends kindergarten, or (b) a child who does not attend preschool still cannot quickly catch up with other more "experienced" classmates and master a kindergarten curriculum at a satisfactory pace, or (c) a child who does not attend preschool will generally perform worse in kindergarten and subsequent grades than children who attend pre-school. To the contrary, while it is entirely possible that a child who attends preschool may have an early jump in kindergarten, it is also possible that a child who does *not* attend preschool will nonetheless fully and easily master and conclude the kindergarten curriculum without missing a beat.

With certain limited exceptions, pre-school is an elective option parents may choose, in their discretion, to provide for their child. There is, however, a clear difference between school and

---

[6] There are certain circumstances, however, when pre-school attendance does arguably become a legal right. For example, in the context of a young child with developmental disabilities, the Individuals with Disabilities Education Act (IDEA), requires school districts to supply a free and appropriate disabled education to children as young as three years of age. *See* 20 *U.S.C.* ¶ 1401; 20 *U.S.C.* ¶ 1412. Hence, disability-related pre-school services may be provided by the district at no charge to the child's family.

pre-school, the former being mandatory[7] and the latter being discretionary. In the case of a divorce where there is no concurrent, independent need for work-related day care, or any other extenuating circumstances compelling pre-school attendance, such as a child's developmental disability and the immediate need for the child to attend a pre-school special education program, there is generally no present law or policy forcing a parent to send a child to pre-school solely for academic or social enlightenment. Certainly, if parents jointly commit to sending a child to pre-school as part of a settlement agreement or a consent order, then the court may enforce such an agreement. *See Konzelman v. Konzelman,* 158 *N.J.* 185, 193, 729 *A.*2d 7 (1999); *Petersen v. Petersen,* 85 *N.J.* 638, 645, 428 *A.*2d 1301 (1981) (recognizing strong public policy supporting enforcement of matrimonial settlements). If there is no such agreement, however, and if there is no concurrent need for work-related day care or other extenuating or special circumstances, then the concept of requiring mandatory pre-school, and compelling a divorced parent to pay for tuition for same, becomes questionable and problematic.

When work-related day care is necessary, however, a different analysis ensues. In such instance, a child's attendance at a reasonable pre-school program may not only be logical, but may in fact be court ordered if the cost is reasonably affordable, and if preschool attendance is substantially designed to meet an ongoing parental need for work-related day care. In both intact and divorced households with two working parents with a young child, there is usually a need for work-related day care. Of course, some people choose not to send their child to pre-school, and instead opt to meet their child's day-care needs by utilizing willing relatives, friends, or neighbors as baby-sitters. While this approach may sometimes work, there can also be serious last-minute scheduling problems if a baby-sitter suddenly becomes unavailable

---

[7] Even parents who choose to home school their school-age children must still legally provide an applicable education.

for a given reason, such as illness, vacation, or other unanticipated conflict.

In situations where divorced spouses are constantly at war with each other, day care issues can become even more unnecessarily complicated. In such circumstance, the obvious and inherent advantage in utilizing an affordable pre-school program is the ongoing stability of a guaranteed seat for the child in a specific classroom during work-related day care hours, without the child being passed back and forth between battling parents in a potentially unreliable patchwork system of conflicting and ever-changing baby-sitters and day-care providers.

Even with an affordable pre-school, however, divorced parties may encounter a multitude of different questions and disputes, including: (1) which pre-school should the child attend for day care purposes; (2) what hours are "work-related" vs. "non-work related" day care; (3) should day care contribution be reduced if the parent is available from time to time to watch the child on some days or hours when pre-school is in session? These and other issues frequently end up in court in expensive motions, often prompted more by personality conflicts between the parents rather than the complexity of any issue itself.

Such is the circumstance in the present case, where two divorced parties who cannot get along are at loggerheads over which pre-school their only child should attend. In considering the best interests of the child, this type of parental stalemate is totally unacceptable. As such, the court must act under parens patriae jurisdiction, and will break the tie by establishing a reasonable method for these parents, and other divorced parents as well, to address such disputes without unnecessary and unreasonable delay.

Pre-school is neither pure "school", as defendant contends, or pure "day care", as plaintiff contends. Rather, pre-school is a sociological cross between these two concepts. As such, the court finds that the most logical and equitable way to address the parties' preschool dilemma is as follows:

■ First, when a pre-school program is being used in substantial part to fill a need for work-related day care, plaintiff, as the primary residential custodian, has the initial right under *Pascale* to select the proposed pre-school program for the child, or to transfer a child from one program to another one.[8]

■ Second, the residential custodian's authority on this issue is not absolute and unlimited. Rather, a caveat to plaintiff's right to select a pre-school program which substantially meets legitimate work-related day-care needs is that the choice must be *reasonable*. Reasonableness includes consideration not only of cost, but of other factors as well, such as location and accessibility, hours and dates of operation, curriculum, and ancillary services (transportation, lunches, etc.). For example, if a custodial parent seeks to move a child from an existing pre-school to another pre-school which substantially increases the cost to the non-custodial parent or the travel time of the non-custodial parent, then such selection may potentially be deemed unreasonable and contrary to the child's best interests, under the totality of the circumstances.

■ Third, absent a restraining order or other court order keeping information regarding the pre-school confidential, plaintiff, as the residential custodian, has an obligation to supply defendant, as the non-custodial parent, with notice of any proposed change in provider in reasonably timely fashion.

■ Fourth, pursuant to *Beck*, defendant, as a joint legal custodian, has a right to investigate and evaluate information about a new proposed pre-school. Defendant does not have the right as a non-custodial parent, however, to unilaterally and arbitrarily block or veto plaintiff's decision on a pre-school or any other child care provider by simply refusing or failing to consent. Rather, if defendant believes plaintiff's selection of pre-school or

---

[8] While not before this court, a different analysis would arguably take place in a case where neither parent is the primary residential custodian and the parties share joint residential custody, thereby rendering *Pascale* inapplicable.

day care provider is unreasonable and contrary to the child's best interests, and if he wishes for the court to review same, then he may exercise his rights under *Beck* by filing a motion with the court, in which the non-custodial parent carries the burden of proof of convincing the court, by a preponderance of the evidence, that the custodial parent's selection or change of the child's pre-school or child care provider is unreasonable and contrary to the child's health, education, general welfare and best interests.

Fifth, if the non-custodial parent is challenging the reasonableness of plaintiff's choice of pre-school, merely complaining about the choice is not enough. Rather, the non-custodial parent must demonstrate that there is a specific, more reasonable alternate plan available for providing work-related day care for the child.

Sixth, if the court finds that the selected pre-school selected by the custodial parent is unreasonable, the court may override the custodial parent's decision and order different day care arrangements including placement at a different pre-school. Alternatively, if the court finds the custodial parent's choice of pre-school day care plan is in fact reasonable, the court may approve same and may order both parties to contribute to same in the same manner as the cost of any other reasonable day care expense.

Seventh, if the court finds that either party is acting unreasonably on the issue, counsel fees and/or other financial sanctions may be issued by the court in its discretion.

This seven-step analysis respects both parties' parental rights, and further blends and incorporates significant principles of both *Beck* and *Pascale* into the process, while keeping a steady focus upon parental reasonableness and the best interest of the child.

Applying this formula to the present case, the court finds that plaintiff has exercised reasonable parental discretion in choosing to change the child's day care provider from Preschool A

to Pre-school B. The two schools are similar in cost, location, and services, and there is nothing objectively unreasonable about the switch. The court further finds that defendant had the right and opportunity as a joint legal custodian to bring his objections to the court, but in doing so, he has failed to demonstrate to the court that the switch of pre-schools is unreasonable, or that the transfer burdens the child, the parent, or the parent/child relationship in any significant way. There is insufficient evidence supporting a conclusion that the plaintiff's decision is contrary to the child's best interests.

For these reasons, the court upholds the plaintiff's decision to switch pre-schools, and directs the parties to continue contributing to the tuition of the new pre-school on an equal basis. The court does not find, however, that defendant's position in challenging plaintiff's choice was legally unreasonable. To the contrary, the case involved a previously unsettled area of the law where both parties clearly had, and continue to have, important rights and interests. The unreasonableness is not in either party's formal legal position, but rather in their ongoing mutual inability to effectively communicate with each other.

There are additional ancillary but relevant points regarding pre-school attendance by a child of divorced parents. For starters, when pre-school charges flat daily or weekly tuition rather than an hourly rate, there may be some time during a child's pre-paid, pre-school attendance which technically is not work-related in nature, but does not reduce the cost in any fashion. For example, if a pre-school operates from 7:00 a.m. to 5:00 p.m., but the custodial parent only works from 8:00 a.m. to 4:00 p.m., there is an hour at the beginning and end of each day, which, in a strict technical sense, may not be work-related. The fact that pre-school tuition may include hours which are not 100 percent work-related in nature does not mean that the non-custodial parent is entitled to a pro rata refund or rebate from the custodial parent for every hour or minute of pre-school falling

outside of working hours, if the child's attendance or non-attendance during these hours does not affect the overall cost.

A minute-by-minute audit and accounting of incidental time in a pre-school day is not required. The more material inquiry is whether the totality of the pre-school program is related in substantial part to the unavailability of the child's parents due to work schedules, and whether the cost for the child to have a guaranteed reserved seat in the class is reasonable under the totality of the circumstances. If the evidence reflects that the custodial parent has selected a pre-school program which involves substantial cost for time not required for work-related day care, then the court may consider this factor as relevant in determining the overall reasonableness of the expense, and whether the non-custodial parent should fairly receive some type of equitable reduction in his or her mandatory obligation to contribute to the cost pre-school tuition.

Another important point in this case is that there may be occasions when defendant, as the non-custodial parent, has available time to spend with the child on days when the child is otherwise scheduled to attend pre-school for work-related day care purposes. Generally, such additional parent/child time is worthy of encouragement, and may take priority over the child's pre-school time, unless perhaps there is a very special event at the pre-school that day, such as a class party or a guest presenter. So long as the non-custodial parent provides reasonable advance notice to the primary residential custodian and school, and so long as the request for occasional extra time is reasonable and there are no other existing court-ordered restrictions on the non-custodial parent's ability to see the child (such as suspended or supervised parenting time), additional parenting opportunities should generally be supported when a working parent can arrange his or her schedule to reasonably accommodate same.

For this reason, the court directs that if defendant's schedule so permits, and upon reasonable advance notice to plain-

tiff, defendant may exercise additional reasonable parenting time with the child when the child is otherwise scheduled to attend pre-school [9]. Such arrangement, however, is generally applicable for pre-school only. When the child starts attending school between grades K–12, a parent generally should not pull a child out of class during school hours except on rare occasions, such as necessary medical appointments or other special circumstances reasonably warranting and justifying same.[10]

When a parent does occasionally take a child out of pre-school for extra parenting time, and the pre-school charges a flat tuition rate, the fact that the non-custodial parent elects to exercise previously uncontemplated parenting time on a scheduled work day does not reduce that parent's obligation to pay the same contribution towards tuition. Put another way, the pre-school may charge the same exact amount for the child's seat, regardless of whether or not defendant takes the child out of class from time to time. In such circumstance, defendant does not somehow unilaterally reduce his mandatory financial contribution towards the child's tuition by taking the child out of class.

---

[9] Reasonable advance notice by the non-custodial parent to the custodial parent of a request for additional time on specific days is logical, as a matter of mutual parental courtesy. A non-custodial parent cannot simply show up at a pre-school or day care and remove a child without prior knowledge of the other party. Such arrangements should generally be set up well in advance, so that all parties as well as the pre-school are aware of same, and so that there are not any misunderstandings. Otherwise, if a noncustodial parent removes a child from preschool without the custodial parent's prior knowledge, and the custodial parent then arrives at the pre-school, this can easily lead to mistaken conclusions that a child is either missing or has been abducted.

[10] The court understands and appreciates that there may be some limited occasions when a parent reasonably wants or needs to take a child out of school, such as for a limited or rare family vacation or other special family circumstance, such as travel to a wedding or funeral. Children rarely have perfect attendance in school. In general, however, once a child begins his or her mandatory education in kindergarten, each parent should strive to avoid unreasonable interruption of a child's formal education and scholastic focus, and keep school absence to a minimal and infrequent occurrence.

In concluding this matter, the court notes that this case warrants one additional but critical observation, which goes far beyond the issue of pre-school itself. As noted, these young parties were only married for four short years. Nonetheless, they spent an extra year of their lives battling in divorce court. Then, after finally reaching a settlement to avoid trial, they returned to court before the ink was dry on their divorce decree, and waged a whole new battle with each other over pre-school. While legally there was merit to each party's position, and while each party's counsel did an exemplary job representing their clients' respective interests, one cannot help but wonder how much more litigation the future holds for these parents, who apparently have no present ability to constructively cooperate with each other, and who may predictably and perpetually continue spending time, money and energy on repeat court appearances. Such a future would be most unfortunate, since the parties remain joint legal custodians of a very young child whose happiness and well-being clearly depends on *both* parents' ongoing ability, and willingness, to reasonably communicate and cooperate with each other on important issues.

When parties are joint legal custodians, public policy generally encourages communication, cooperation, and hopefully a harmonious consistency in parental judgment.[11] *See Beck, supra,* 86 *N.J.* at 488, 432 *A.*2d 63; *Grover v. Terlaje,* 379 *N.J.Super.* 400, 406, 879 *A.*2d 138 (App.Div.2005). To this end, as a society we always hope that divorced parents will not only amicably transition into a mutually respectful and positive parental partnership, but will also be able to reach joint consensual agreements on future significant parenting issues which may arise during their child's minority. Sometimes, however, reaching this goal can be extraordinarily challenging for many parents.

---

[11] There are some situations, however, where direct communication is not only discouraged but prohibited, such as when there is an active restraining order against one or both parties under New Jersey's Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–1 to 33.

The court recognizes the reality that the reason why many couples separate and divorce is because they have, at the very least, "irreconcilable differences." *N.J.S.A.* 2A:34–2(i).   While such differences may or may not have dealt directly with child-rearing issues, contentious ex-spouses with "irreconcilable differences" may face an uphill climb in attempting to transition into functional joint legal custodians.   Nonetheless, this climb is worth attempting, and there are many ex-spouses who have successfully made the transition from litigious adversaries into mutually respectful co-parents.   Most likely, those who accomplish this transition jointly recognize at some point that their *child's* needs come first, including the paramount need for the child to have functional rather than dysfunctional parents, who can civilly cooperate with each other and serve as positive role models for their child in the process.

In this case, the reality is that the parties have at least fifteen more years of co-parenting on the horizon.   They have already been to court twice in one year, and may very likely continue this pattern, to their child's emotional and financial detriment, unless they both agree to attempt a drastic change in their interpersonal dynamics.   While the parties always technically retain the right to repeatedly return to court over newly arising issues, what they truly need for their child's sake, as well as their own, is to commence participation in professional co-parenting counseling, and mutually work in a constructive and pro-active manner on improving their long-term ability to communicate and cooperate with each other as effective joint legal custodians.

Further, even if one or both parties decline to voluntarily attend professional co-parenting counseling, this court maintains the discretion, and right, to *require* both parties to attend co-parenting counseling with each other, under the direction of an appointed professional therapist for a designated period of time.[12]

[12] Co-parenting counseling can be ordered so long as there is no restraining order in place.   In this case, there is no restraining order between the parties.

Hence, if these parties do return to court in the future and continue to demonstrate a chronic inability to effectively function as co-parents, the court may on its own motion, sua sponte, enter an order compelling the parties to attend mandatory co-parenting counseling, even over objection, at parental cost and in the court's discretion.

Joint legal custody is more than simply an honorary title bestowed upon a parent. Rather, a joint legal custodian has an ongoing responsibility to act in a child's best interest, which includes reasonable communication and cooperation with the other joint legal custodian in a positive and constructive fashion. Hence, if two joint legal custodians have ongoing difficulties in meeting this very basic component of their roles, then the court may order, among other relief, co-parenting counseling as a condition of ongoing joint legal custody, consistent with parens patriae jurisdiction and the court's own obligation to protect the best interests of the child.